THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TOMMIE DALE et al., Defendants-Appellants.

First District (1st Division) Nos. 1—86—0515, 1—86—0716 cons.

Opinion filed September 29, 1989.

Gordon H. Berry, of State Appellate Defender's Office, of Chicago, for appellant Tommie Dale.

Randolph N. Stone, Public Defender, of Chicago (Linda J. Seeley, Assistant Public Defender, of counsel), for appellant Clarence Dukes.

Cecil A. Partee, State's Attorney, of Chicago (Paula Carstensen, Special Assistant State's Attorney, and Inge Fryklund, Assistant State's Attorney, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Tommie Dale and Clarence Dukes (defendants) were charged with murder, rape, home invasion, residential burglary and robbery (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1, 11—1, 19—3, 18—1). Prior to defendants' trials, the trial court granted defendants' motions for severance. Following the simultaneous bench trial of Dale and jury trial of Dukes, in which evidence applicable only to Dale's case was heard outside the presence of the jury, defendants were found guilty of all charges. For their murder convictions, the trial court imposed extended-term sentences of 60 years for Dale and 80 years for Dukes. Defendants also received concurrent sentences of 30 years for rape and home invasion, 15 years for burglary and seven years for robbery.

Dale appeals his sentences on the ground that they are excessive. We affirm.

Dukes appeals his convictions and sentences, contending the following: (1) the trial court committed reversible error in denying his motions to quash his arrest and suppress his statements; (2) he was denied a fair trial by the trial court's refusal to pose certain questions to the venire; (3) he was denied equal protection of the laws due to the State's exercise of peremptory challenges; (4) his sixth amendment right to confrontation and the rule against hearsay were violated by the introduction of certain evidence concerning his codefendant; (5) prejudicial error occurred in the introduction of improper rebuttal testimony of a collateral matter; (6) he was not proven guilty beyond a reasonable doubt; (7) he was denied a fair trial by improper prosecutorial comments during closing argument; (8) his constitutional rights were violated when he was found "death eligible" because the Illinois death penalty statute is unconstitutional; (9) the trial court relied on improper sentencing guidelines; and (10) his sentence is excessive and unfairly disparate to his codefendant.

■■ Because the United States Supreme Court decision in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, decided during the pendency of this appeal, is retroactively applicable to the case at bar (*Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708), it is necessary that we remand Dukes' case to the trial court for a two-part hearing on his contention that he was denied equal protection of the laws by the State's purposeful discrimination in the selection of jurors against a cognizable racial group, of which Dukes is a member. The record here demonstrates that 9 of 12 of the State's peremptory challenges were exercised on black prospective jurors, where the final venire consisted of four blacks. In light of the Illinois Supreme Court's comments in *People v. Evans* (1988), 125 Ill. 2d 50, 530 N.E.2d 1360, and the United States Supreme Court's language in *Batson*, we believe the determinations necessary to both facets of the *Batson* hearing—in which the defendant must first make a *prima facie* showing of purposeful discrimination, and, if the defendant meets this burden, the State must then come forward with a racially neutral explanation for the exclusion of the jurors—are appropriately to be made by the trial court, consistent with the dictates of the *Batson* opinion.

If the trial court finds that the State has purposefully discriminated in the selection of jurors, Dukes' conviction and sentence must be vacated and he is entitled to a new trial consistent with this opinion. If the court finds that Dukes has not made out a *prima facie* case of racial discrimination, or that the State has presented sufficient neutral explanations to rebut Dukes' *prima facie* case of racial

710

discrimination, Dukes' convictions and sentence will be affirmed.

The lengthy evidence introduced in the case at bar will be narrated as follows. The evidence offered in connection with the trial court's denial of Dukes' pretrial motions to quash his arrest and suppress his statements will be set forth later in the opinion as the issues pertinent to those facts are addressed. The evidence adduced at the trials of both defendants is detailed below.

Eddie Thompson, a 38-year-old previously diagnosed schizophrenic, testified for the State as follows: On November 13, 1983, at approximately 11 p.m., she and her 60-year-old husband, Joe Thompson, who suffered from curvature of the spine, were at the "Your Place Lounge," a bar located around the corner from their 2333 East 70th Place apartment. While at the bar, Joe introduced Eddie to a man named "Tommie." After a few drinks, the Thompsons proceeded to their apartment, but Eddie later returned to the bar to retrieve her missing keys. An argument ensued between the Thompsons upon Eddie's return to the apartment without the keys, and Joe thereafter locked Eddie out of the apartment.

Eddie returned to the bar at approximately 1 a.m. to call the police. There, she told Tommie that she was locked out of her apartment, requested his assistance, and offered to let him sleep on the couch with her. Tommie and Eddie then went to the Thompson apartment.

Following Joe's refusal to open the apartment door, Tommie kicked the door in and grabbed Joe. Eddie told Tommie to leave Joe alone and gave Joe bus fare to leave the apartment upon Tommie's demand. Tommie proceeded to take the rest of Eddie's money, approximately $38, and a second purse from her bedroom. Tommie left. The police came to the Thompson apartment and left.

Tommie later returned to the Thompson apartment with a second man whom Eddie had never seen before. Eddie invited them into the apartment. Joe and the second man began fighting. When Joe fell to the floor, the second man kicked him in the head and mouth. Both men threatened to kill Eddie if she told anyone. They then ransacked the apartment. The second man struck Eddie and broke her nose. Both men told Eddie and Joe to remove their clothing. Tommie told Eddie to lie on the couch and then inserted his penis into her vagina. The second man thereafter performed the same act on Eddie. Both men gathered electrical cords from the apartment. The second man tied up Joe and Eddie with the cords, during which time Tommie packed clothing and food in two black and burgundy suitcases. Joe was tied to a chair with the cord wrapped around his neck "Chinese

style," with the cord extending to his wrists and ankles, which were tied behind his back. Both men then left.

Subsequent to the men leaving the apartment, Eddie broke loose from the cords and untied Joe. She thought he was dead at this time. Eddie waited an hour and a half until daybreak and then went to her aunt's house to call the police.

Lula Thompson, Eddie's aunt, testified that around dawn on November 13, 1983, Eddie came to her house and stated that two men had beat them and raped her in their apartment. She noticed bruises and swelling on Eddie's face at the time.

Dr. Jung Wang testified that he treated Eddie at Jackson Park Hospital on November 14, 1983, for a broken nose and a bruised and swollen face. A genital exam revealed no injuries, tearing or discharge. Eddie told Wang at that time that two men broke in, tied her up, raped her, and beat up her husband.

Dr. Edmond Donghue, deputy chief medical examiner, testified that Joe Thompson died from ligature strangulation. Sixteen external injuries to his head and neck area were found, consistent with a beating.

Police crime scene investigator Thomas Reynolds collected blood, cloth, cords and fingerprints from the Thompson apartment at 10:15 a.m. on November 14, 1983. John Olegniczak, a latent fingerprint examiner, testified that a fingerprint was identified as matching defendant Dale's left index finger. Officer Edward Triggs testified to the ransacked condition of the apartment, which he observed on November 13, 1983. He also testified that he spoke to Eddie briefly at the crime scene and that her face was bruised and swollen. Photographs depicting the apartment and Eddie on the day in question were entered into evidence.

Douglas Middleton, the bartender at the "Your Place Lounge" on the evening of November 13, 1983, testified that on that evening, Joe, Eddie and Dale were at the bar, all of whom he knew from contacts on previous occasions. Dukes arrived after Joe and Eddie had left the bar, at which time Dale first introduced Dukes to Middleton. Eddie reappeared at the bar, and Dale later left with her to provide assistance in entering her apartment. Dale returned 45 minutes later, and Dale and Dukes remained at the bar until they left together at closing at approximately 3 a.m. Although Middleton knew Dale by his first and last name, he did not give the last name to the police until November 7, 1984. Middleton identified Dale in a lineup on November 8, but did not identify Dukes because he was afraid of him.

Detective Grefshiem testified to the investigation leading to the

arrest of defendants. He stated that, although Middleton had previously denied knowledge of the incident, he had a conversation with him on November 7, 1984, a year after the incident. Following this conversation, Detectives Grefshiem and Markham proceeded to Dale's home at 1850 South Drake and arrested him as he was leaving the building.

After a conversation with Dale, the detectives returned to Dale's home and recovered a black and burgundy suitcase from Dale's grandmother. The detectives then proceeded to Dukes' apartment at 1847 West Lake Street, where they arrested him.

On the evening of November 7, 1984, Eddie tentatively identified Dale in a lineup, but did not identify Dukes. Middleton viewed a second lineup conducted on November 8 and identified Dale, but did not identify Dukes. On cross-examination, Grefshiem reasserted that he observed Dukes in the lineups on November 7 and November 8 and admitted that he had testified at an earlier hearing that he did not see Dukes after 7 p.m. on November 7.

Outside the presence of the jury, a stipulation was entered that Dale gave a written statement, transcribed by court reporter Janet Lupa, to Assistant State's Attorney John Kinnane on November 8, 1984. In this statement, Dale stated that he was at the "Your Place Lounge" on November 13, 1983, with his brother, Dukes. A woman told him she had been locked out of her apartment, and he and Dukes accompanied her to her apartment to render assistance. At the apartment, Dukes kicked the door in, hit Joe several times, and raped Eddie while Dale packed things in a suitcase. Dukes left the suitcase at their mother's home.

Assistant State's Attorney Ray Brogan read to the jury a court-reported statement purportedly made by Dukes on November 9, 1984, in which Assistant State's Attorneys Brogan and Lynch, Detective Glynn and court reporter Janet Lupa were present. The statement indicates that on November 13, 1983, Dukes received a telephone call from his brother Dale, who stated, "Clarence, come on down to the bar and have a couple drinks with me. There is a bitch down here dying to fuck." Dukes went to the "Your Place Lounge," where a woman offered Dukes and Dale $45 to assist her in entering her apartment. All three arrived at Eddie's apartment at approximately 1 a.m.

Dale kicked the door open, and they entered the apartment. A man in his late fifties swung at Dale, who in turn hit him and knocked him down. Dale told the man to take off his clothes and tied him up "Chinese style," with a rope around his head, neck and arms.

The woman offered both Dale and Dukes $45 if they would have sex with her. Dale had sex with her first, then Dukes had sex with her while Dale ransacked the apartment. Before they left, Dale tied the woman to a chair with a lamp cord. They each took one black and maroon suitcase as they left. At the end of this statement, Dukes stated that he had not been mistreated by police and that he had been given coffee and cigarettes.

Brogan further testified to the jury, over defendant's objection, that he was aware of another statement made by someone else and that he checked Dukes' statement against it and found Dukes' statement to be accurate.

Court reporter Lupa testified that at the time she took Dukes' court-reported statement, she did not observe him being mistreated and that she took a photograph of Dukes, introduced as an exhibit, which accurately depicted his appearance at the time.

Dukes testified to the events surrounding his arrest and post-arrest detention. At the time of his arrest on November 7, 1984, at 6 p.m., the police, with guns drawn, came to his door and stated that his brother Dale had been killed and asked him to accompany them to the police station. He had not eaten since lunch that day, and his only opportunity to sleep during his upcoming detention was in a "bullpen" on a steel bench, where he did not sleep too much. After standing in a second lineup, Grefshiem took him to a small room and beat him on the chest. Later, after talking to the assistant State's Attorney, he agreed to sign a statement so that he would not be hit anymore. The statement he signed was not true.

On cross-examination, Dukes denied stating at his motion to suppress hearing that he never spoke to an assistant State's Attorney at the police station. He admitted signing and initialing the court-reported statement, but stated he was unaware of its content. He further admitted the truthfulness of portions of the statement, namely, that he was in the bar and that he saw his brother and the woman who testified in court there.

The following stipulations were read to the jury. When Detective Triggs arrived at the apartment on November 13, 1983, Eddie stated she wanted no service. Dukes saw a doctor at Cook County jail on November 13, 1984, and told him he had chest pains and that he was recently hit in the chest. His chest showed palpitive pain over the fourth, fifth, and sixth ribs on the left side. Karen Smith Thompson, an expert microanalyst, found no sperm in the vaginal smear taken from Eddie.

Subsequent to the introduction of the defense evidence, the fol-

lowing rebuttal evidence was introduced by the State. Assistant State's Attorney Lynch testified that he and Detective Steven Glynn were present for the court-reported statement of Dukes and that he did not see Grefshiem at the station that night. Glynn testified that he and his partner, Detective Regan, continued with the investigation of the case at 4:30 a.m. on November 8, 1984, after which time Grefshiem went off duty. At approximately 8:45 p.m., Glynn showed Dukes Dale's statement, at which time Dukes stated he would tell the truth. Dukes made an oral statement at that time to him.

Further stipulations were entered at this time. Andre Watkins, medical intake worker at Cook County jail, would testify that he examined Dukes on November 9, 1984, and that Dukes did not complain of chest pain. A body chart made at the time of Dukes' admittance to Cook County jail showed no bruises. Court reporter Christina Adams would testify that the transcription of Dukes' testimony at the June 21, 1985, motion to suppress hearing was a true and accurate account of Dukes' testimony.

Addressing Dukes' remaining contentions on appeal, we commence with the two constitutional claims asserted by Dukes to support his contention that the trial court erred in denying his pretrial motions to suppress his statements. Dukes argues under his fifth amendment claim that his statement was not voluntarily given due to emotional and physical cruelty inflicted upon him by police officers. Under his fourth amendment claim, Dukes maintains that his arrest was invalid because police officers did not have probable cause or a warrant for his arrest, and he argues that his statements given subsequent to the arrest must be suppressed due to the taint of this illegality.

■ With regard to Dukes' fifth amendment claim, the test courts have utilized to determine whether confessions are voluntarily given is whether, under the totality of the circumstances, the confession has been made freely and voluntarily and without compulsion (*People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 371), or whether the defendant's will was overborne at the time so as not to be the product of a rational intellect and free will (*Townsend v. Sain* (1963), 372 U.S. 293, 9 L. Ed. 2d 770, 83 S. Ct. 745; *People v. O'Leary* (1970), 45 Ill. 2d 122, 257 N.E.2d 112). The trial court need be convinced only by a preponderance of the evidence that the statement in question was voluntary (*Lego v. Twomey* (1972), 404 U.S. 477, 489, 30 L. Ed. 2d 618, 627-28, 92 S. Ct. 619, 627; *People v. Reed* (1984), 123 Ill. App. 3d 52, 59, 462 N.E.2d 512, 518), and our review of the voluntariness question is limited to whether the trial court's finding

is against the manifest weight of the evidence (*e.g., People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, 606; *People v. Kincaid* (1981), 87 Ill. 2d 107, 117-18, 429 N.E.2d 508, 512; *People v. Daugherty* (1987), 161 Ill. App. 3d 394, 397, 514 N.E.2d 228, 231; *People v. Reed* (1984), 123 Ill. App. 3d 52, 59, 462 N.E.2d 512, 518). Dukes claims two factual circumstances support his contention that his statement was not voluntarily given: first, his lack of food and sleep during a 33-hour detention period, and, second, a physical beating inflicted upon him by a police officer. In reviewing the evidence presented concerning these allegations on review, this court may consider both the evidence introduced at the suppression hearing, as well as the evidence adduced at trial. (*People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223; *People v. Summers* (1981), 100 Ill. App. 3d 170, 426 N.E.2d 937.) Consideration of trial testimony is permitted because the trial court's pretrial suppression ruling is not final and may be changed at any time prior to final judgment. (*Caballero*, 102 Ill. 2d at 35-36, 464 N.E.2d at 229.) The trial evidence relating to Dukes' confession has been previously summarized; that presented at the suppression hearing follows.

Detective Markham testified that after Dukes' arrest at 6 p.m. on Wednesday, November 7, 1984, he and Grefshiem escorted him to a conference room at "Area One," where they advised him of his *Miranda* rights. After questioning Dukes briefly at approximately 7 p.m., they left him alone in the interview room until 9 p.m., at which time he was placed in a lineup and afterwards again left alone in the interview room. During this time in the interview room, Dukes was not questioned or handcuffed. At approximately 1 a.m., Markham took Dukes to the lockup, where he remained until 3:20 p.m. on November 8. At that time, Dukes was placed in a second lineup and afterwards given *Miranda* warnings and questioned briefly by Markham. Markham offered Dukes some food at this time, but Dukes refused his offer.

Detective Glynn testified that after Markham went off duty, he and his partner Regan took Dukes, at approximately 9 p.m., from the lockup to the "Area One" interview room. There, he was again advised of his *Miranda* rights. After Glynn read parts of Dale's statement to Dukes, Dukes indicated he would tell the truth. Dukes then gave an oral statement. Dukes was never hit or threatened, and he never asked to see an attorney.

Assistant State's Attorneys Brogan and Lynch spoke to Dukes around 11 p.m. for approximately 30 to 45 minutes. At approximately 2:15 a.m., Dukes gave a court-reported statement after again

being advised of his *Miranda* rights.

Dukes testified that he had not had dinner prior to his arrest at 6 p.m. on November 7, and he had nothing to eat until he had a bologna sandwich on Friday morning, November 9, after his court appearance at 26th and California. While at the "Area One" police station at 51st and Wentworth, Dukes stated he lost track of time as he was taken back and forth from "room 202" to three lineups. Then he was taken to the lockup, where he slept.

Later, he was escorted back to "room 202" and handcuffed to a bar against the wall. On questioning by Grefshiem, Dukes stated he did not want to talk. Grefshiem pointed his finger between Dukes' nose and eye and said, "you're going to make a statement," and proceeded to hit him several times in the chest. Grefshiem left and returned with Dale's statement. Grefshiem hit Dukes again in the chest, but Dukes refused to give a statement. Grefshiem left and returned with some papers. Dukes signed the papers because he thought they were release papers.

Dukes requested to see a doctor when he was admitted to Cook County jail on Friday, November 9, but was told the doctor would not be in until Monday. When he saw the doctor on Monday, the doctor instructed him to take Tylenol for his chest pain.

On cross-examination, defendant first stated that he did not remember seeing a paramedic at the jail on November 9, but then testified that he spoke with a man who questioned him about his physical condition. He stated the man did not examine his chest. He further stated on cross-examination that he never spoke to Detective Glynn or Assistant State's Attorneys Brogan or Lynch and that no court reporter came to the police station to take his statement.

On rebuttal, Grefshiem testified that he never struck Dukes and that he was not present at "Area One" when Dukes gave his statements to Glynn, Brogan and Lynch. The only time Grefshiem spoke to Dukes was at 7 p.m. on November 7, 1984.

■ After reviewing the trial and suppression hearing evidence concerning the totality of the circumstances here, we hold that the trial court's finding that the State proved the voluntariness of Dukes' confession by a preponderance of the evidence was not against the manifest weight of the evidence. The State's evidence indicates that during the period of Dukes' detention, he was repeatedly advised of his *Miranda* rights and did not request an attorney. Dukes was not questioned for lengthy periods of time. There were extended intervals between questioning when Dukes was left unattended without handcuffs, including a night and half day in the lockup, where Dukes

admitted he slept. Dukes did not request food from any of the officers testifying at trial, and at some point he was offered food. Further evidence indicated that Dukes did not complain to an assistant State's Attorney of mistreatment or appear to those present at his court-reported statement to be mistreated, that Grefshiem was not present at the police station when Dukes gave his statement, and that no signs of chest injury were found when he was first admitted to the county jail. This evidence sufficiently supports the trial court's finding.

■ We reject Dukes' arguments urging us to find to the contrary. As to his physical beating claim, Dukes concedes that the trial court resolved the issue of his and Grefshiem's credibility at the motion to suppress hearing. He argues, however, that the testimony from Dr. Lindenberger at trial as to his November 13 findings of chest injuries, together with his own testimony, demonstrate that he was injured while in custody, thereby requiring the State to prove by clear and convincing evidence that the injuries were not a result of police brutality. He further maintains that the State did not meet this burden because, under *People v. Wilson* (1987), 116 Ill. 2d 29, 506 N.E.2d 571, a mere denial by the police is not sufficient to meet this standard.

We find this contention without merit. First, the standard Dukes cites applies only where it is clearly established that defendant received injuries while in police custody. (See *Wilson*, 116 Ill. 2d 29, 40, 506 N.E.2d 571, 586, citing *People v. La Frana* (1954), 4 Ill. 2d 261, 267, 122 N.E.2d 583, 586.) Unlike *Wilson*, where the evidence showed the defendant had only slight injuries at arrest but extensive injuries several hours later after giving a statement, Dr. Lindenberger's findings of palpitive and muscular chest pain four days after Dukes' admission to the county jail and after his confession does not clearly establish that Dukes was injured while in police custody before giving his statement. Second, even assuming the State was required to meet a higher standard of proof, we believe the above-mentioned evidence satisfied the State's burden.

As to Dukes' claim relating to his lack of food and sleep while in detention, Dukes cites cases where courts have considered the deprivation of food and sleep from a defendant for a lengthy period of time as factors in finding the defendant's statement involuntary. (*Payne v. Arkansas* (1958), 356 U.S. 560, 2 L. Ed. 2d 975, 78 S. Ct. 844; *Reed*, 123 Ill. App. 3d 52, 472 N.E.2d 512.) These cases are distinguishable from the instant case in numerous respects, including the fact that the courts in those cases found the police deliberately

attempted to induce a confession by withholding food and sleep.

In the case at bar, the trial court found the officers' testimony that defendant was not handcuffed, that he was not questioned for lengthy periods of time, and that he was at one point offered some food to be credible. The court also found no credible evidence that Dukes was subjected to physical or mental coercion. This finding is supported by Dukes' contradictory testimony at trial and at the suppression hearing concerning the circumstances of his statement.

Nonetheless, Dukes asserts that since his testimony that he did not eat anything during the 33 hours between his arrest and the time he signed the court-reported statement was not contradicted by the State's witnesses at the suppression hearing or at trial, his testimony cannot be disregarded. The cases upon which he relies in support, *People v. Rhoads* (1979), 73 Ill. App. 3d 288, 391 N.E.2d 512, and *Haynes v. Washington* (1963), 373 U.S. 503, 10 L. Ed. 2d 513, 83 S. Ct. 1336, involve police officers who were in a position to readily deny the defendant's claim. In *Rhoads*, the court emphasized that the officer present at trial was in a unique position to rebut the defendant's claim of promises made by the officer. It found that the officer's failure to rebut gave credence to defendant's charge. Likewise, in *Haynes*, the court noted "this testimonial void is the more meaningful in light of the availability and willing cooperation of the policemen who, if honestly able to do so, could have readily denied the defendant's claim." (*Haynes*, 373 U.S. at 510, 10 L. Ed. 2d at 519, 83 S. Ct. at 1341.) Here, the officers at the suppression hearing and at trial were not in Dukes' presence during the entire period of his detention and were not in the position to testify as to whether he was given food at any time. Moreover, since the trial occurred some time after Dukes' arrest, it cannot be said that the police could have readily contradicted Dukes' testimony.

■ Turning to Dukes' fourth amendment claim, he maintains that his statements were the fruits of an illegal arrest and therefore should be suppressed. While Dukes did not raise this issue in his post-trial motion, the issue was raised in the pretrial motion to suppress and orally at the post-trial motion. Under these circumstances and because the claim involves substantial rights, we will not find a waiver here. See 107 Ill. 2d R. 615; *People v. Friesland* (1985), 109 Ill. 2d 369, 488 N.E.2d 261.

The following evidence was adduced at the pretrial suppression hearing concerning Dukes' arrest. Detective Markham testified that he had learned from Eddie Thompson in December 1983 that the crimes in issue had been perpetrated by two black males. She had

met one of the perpetrators, who was slightly built, about 5 feet 5 inches and 130 pounds, at the "Your Place Lounge" and knew him by the name of "Tommie." Eddie also told the police that two black and burgundy suitcases were taken by the offenders.

Markham testified that after pursuing the investigation for almost a year, he and Grefshiem learned from Douglas Middleton, the bartender at the "Your Place Lounge," that Dale was at the lounge on the night of the murder, that the bartender had seen him leave the bar with Eddie, later return to the bar, and finally leave the bar at approximately 3 a.m. with a person whom Dale had introduced to the bartender as his brother.

Markham further testified that they then arrested Dale at 1:45 p.m. on November 7, 1984. Dale gave an oral statement implicating his brother Dukes to Grefshiem and Markham, in which he stated that Dukes had accompanied him from the "Your Place Lounge" to the Thompson apartment, where Dukes committed the offenses, and that a suitcase taken during the home invasion was at his mother's home.

Upon concluding their conversation with Dale at 2:30 p.m., Markham and Grefshiem looked unsuccessfully for Douglas Middleton for a possible lineup identification and procured a Bureau of Identification sheet and photo of Dukes. They next went to the home of the defendants' mother, where a black and maroon suitcase was recovered from defendants' grandmother. The officers then proceeded to Dukes' apartment at about 6 p.m.

After Markham announced that he was a police officer and looking for Dukes, a woman invited him into the apartment and summoned Dukes from another room. The officers then placed Dukes under arrest at the front door.

Testifying in his own behalf, Dukes stated that at the time of his arrest, he was in his apartment with his girlfriend when he heard a knock at his apartment door. The officers announced that they were police. He opened the door to observe plaincothes police officers with guns. They told him his brother had been shot and asked him to go with them. Dukes accompanied them to the police station.

■ Dukes' initial argument in support of his fourth amendment contention is that the police lacked probable cause in their warrantless arrest. To meet their burden of establishing probable cause, the State must prove that the police had reasonable grounds to believe that an offense had been committed and that the arrestee had committed it. (*People v. Martin* (1977), 46 Ill. App. 3d 943, 361 N.E.2d 595.) The probable cause determination is a commonsense, practical

question to be determined by the totality of the circumstances, and the information relied upon to establish probable cause to arrest must be supported by some indicia of reliability. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.) The trial court's finding of probable cause will not be disturbed on review unless manifestly erroneous. *People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280.

■ Dukes argues that the officers' information as to his identity is insufficient for probable cause because it consists solely of the uncorroborated statements of a suspect attempting to shift blame. Information from a suspect which implicates another may provide sufficient grounds for probable cause where the information is buttressed by corroborating evidence. (*People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d 998; *People v. Johnson* (1989), 187 Ill. App. 3d 756.) In *James* (118 Ill. 2d 214, 514 N.E.2d 998), the supreme court found sufficient reliability in a suspect's implication of a codefendant to establish probable cause where the suspect was not absolved of criminal liability by implicating the codefendant and the suspect's statements were corroborated by the officers' personal knowledge of the details of the crime. The supreme court acknowledged that no independent verification existed that the codefendant was the person involved in the criminal conduct, but concluded that the portion of the suspect's statement which was verified lent credence to the remaining unverified portion. *James*, 118 Ill. 2d at 225, 514 N.E.2d at 1003.

■ Even more corroboration exists in the instant case than in *James*. At the time of Dukes' arrest, in addition to Dale's statement implicating his brother Dukes, in which he gave specific details of the incident and was not absolved from liability, the police were also aware that the offenses were committed by two black males, one named "Tommie," that "Tommie" Dale had been seen leaving the "Your Place Lounge" with Eddie on the night of the commission of the offenses, and that a man identified as Dale's brother was seen with Dale leaving a bar located near the victims' apartment around the time of the commission of the offenses.

We reject Dukes' argument that *James* has been undermined by the United States Supreme Court's decision in *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056, where the Court labeled an accomplice's confession that incriminates a defendant as "presumptively unreliable." The Court's statement was made in reference to testimony used for determining guilt, not for the purpose of the probable cause determination. We, therefore, hold that the trial court's determination that the officers had probable cause to ar-

rest Dukes is not manifestly erroneous.

■■ Dukes next argues that his fourth amendment rights were violated when he was arrested in his home without a warrant. Absent exigent circumstances, the fourth amendment prohibits the police from making a nonconsensual entry into a person's home to effectuate an arrest without a warrant. (U.S. Const., amends. IV and XIV; *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.) The circuit court found exigent circumstances justified the warrantless arrest.

In determining whether exigent circumstances are present to justify a warrantless arrest, lower Federal courts have utilized the factors outlined in *Dorman v. United States* (D.C. Cir. 1970), 435 F.2d 385: (1) the gravamen of the offense; (2) whether the suspect is reasonably believed to be armed; (3) whether there is a clear showing of probable cause; (4) whether there is strong reason to believe the suspect is in the premises; (5) the likelihood that the suspect will escape if not swiftly apprehended; (6) whether the police entry was peaceful; and (7) whether the entry is made at night. The Illinois Supreme Court has added other nonexhaustive factors as relevant to the determination, including whether the offense has been recently committed and the existence of a deliberate or unjustified delay. (*People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677.) These factors serve merely as guidelines and are not to be rigidly applied in each case. The guiding principle in a court's determination is reasonableness. *White*, 117 Ill. 2d at 216-17, 512 N.E.2d at 685.

■■ After evaluating the circumstances present in the case at bar under the above guiding factors, we conclude that the trial court did not err in finding the existence of exigent circumstances here. Subsequent to Dale's implication of Dukes, the police here continued their investigation in the field, aware of the grave, violent crimes involved. During their investigation, they recovered a suitcase believed to be taken from the scene of the crimes after going to the home of both defendants' mother. A strong likelihood existed that Dukes could escape due to the fact that Dukes' brother was in custody for the crimes and the police had visited the home of defendants' mother in pursuit of their investigation. Dukes' arrest was also effectuated peaceably.

While Dukes emphasizes that the passage of time from the commission of the offense to his arrest was a full year, we do not believe this dictates against finding an exigency of circumstances here. The circumstances in the instant case are not like those in *People v. White* (1987), 117 Ill. 2d 194, 512 N.E.2d 677, where police *learned*

of the defendant's identity but did not effectuate the arrest until two weeks later, during which time they could have procured a warrant. The police in the instant case learned of Dukes' identity on the same day of his arrest and thereafter diligently pursued their investigation until his arrest.

Furthermore, we believe an additional reason exists for upholding Dukes' warrantless arrest. The State's burden of proving that consent was freely and voluntarily given (*Bumper v. North Carolina* (1968), 391 U.S. 543, 548-49, 20 L. Ed. 2d 797, 802, 88 S. Ct. 1788, 1792) was satisfied through the testimony of the officers who effectuated the arrest. Although the trial court did not base its ruling on the issue of consent, a judgment may be sustained on any grounds discernible from the record. *People v. Bolden* (1987), 152 Ill. App. 3d 631, 637, 504 N.E.2d 835, 839-40.

Consent may be given by a third party who has control over the premises (*United States v. Matlock* (1974), 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988; *People v. Bean* (1981), 84 Ill. 2d 64, 417 N.E.2d 608; *People v. Kraman* (1981), 96 Ill. App. 3d 390, 421 N.E.2d 346), although consent will not be found by a mere showing of acquiescence to a claim of lawful authority. (*Bumper*, 391 U.S. at 548-49, 20 L. Ed. 2d at 802, 88 S. Ct. at 1792.) The officers' testimony that they were invited into the apartment by Dukes' live-in girlfriend upon merely announcing that they were police officers and looking for Dukes supports a finding of consent here.

Finally, even assuming the illegality of Dukes' arrest, exclusion of Dukes' post-arrest statements is not warranted here because they were not obtained by exploitation of the illegality of the arrest. The United States Supreme Court in *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, has identified four factors in determining whether the taint of the illegal arrest is dissipated: (1) whether the defendant received *Miranda* warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct.

The first *Brown* factor, the issuance of *Miranda* warnings, alone does not attenuate an illegal arrest. (*Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) The second *Brown* factor, the temporal proximity of the arrest and confession, has been attacked as not considering the inherently adverse effects of prolonged illegal incarceration. (*In re R.S.* (1981), 93 Ill. App. 3d 941, 945, 418 N.E.2d 195, 199; *Dunaway*, 442 U.S. at 220, 60 L. Ed. 2d at 841, 99 S. Ct. at 2260 (Stevens, J., concurring).) Thus, while

Dukes was in custody for over a 27-hour period, we do not believe this alone dissipates the illegality of the arrest.

Turning to the third *Brown* factor, the Supreme Court in *Brown* did not define what constitutes an intervening factor. The State urges that the intervening circumstance here is Dukes' confrontation with Dale's statement. Some case law and commentators have identified one kind of intervening circumstance as a confrontation of the arrestee with untainted evidence which produces a voluntary desire to confess. *In re R.S.*, 93 Ill. App. 3d at 947, 418 N.E.2d at 199; 3 W. LaFave, Search & Seizure §11.4(b), at 637 (1978); *Commonwealth v. Barnett* (1977), 471 Pa. 34, 369 A.2d 1180.

In *People v. Gabbard* (1979), 78 Ill. 2d 88, 398 N.E.2d 574, the Illinois Supreme Court found an intervening circumstance to purge the taint of the illegal arrest where the defendant was confronted with a sketch prepared prior to his arrest and was advised that he was identified in a lineup. In reaching its conclusion, the *Gabbard* court cited a Pennsylvania case with facts similar to the instant case. In *Commonwealth v. Wright* (1975), 460 Pa. 247, 332 A.2d 809, the court found an intervening circumstance to purge the taint of the illegal arrest where the defendant had initially denied participation in the crime after his arrest, but then confessed after an accomplice was arrested and made a statement to police implicating the defendant, which he later repeated in the defendant's presence.

Similarly, we find that Dukes' confrontation with his accomplice's untainted statement, which was obtained prior to his arrest, was an intervening circumstance that purged the taint of any illegal arrest.

■■ Dukes next contends that he was denied a fair trial by the trial court's failure to ask certain *voir dire* questions requested by the defense. In *People v. Zehr* (1984), 103 Ill. 2d 472, 477, 469 N.E.2d 1062, 1064, the Illinois Supreme Court outlined six points that prospective jurors should be interrogated concerning: (1) the defendant's presumption of innocence; (2) that a defendant is not required to offer any evidence on his own behalf; (3) their knowledge of the premise that a defendant must be proved guilty beyond a reasonable doubt; (4) whether they would hold a defendant's failure to testify against him; (5) whether they would have any prejudice against returning a verdict of not guilty were they to find the State failed to sustain its burden beyond a reasonable doubt; and (6) whether they would have any prejudice against returning a verdict of guilty were they to find the State sustained its burden of proof.

■■ Despite requests from the defense, the trial court in the instant case did not interrogate the jurors individually concerning

defendant's right not to testify and whether the jurors would hold his failure to testify against him. The court did, however, instruct the jurors as a group concerning defendant's right not to testify or provide evidence both before and after the impanelment of the jury. The court also individually questioned the jurors as to whether they had any problem following the law.

In *People v. Emerson* (1987), 122 Ill. 2d 411, 426-27, 522 N.E.2d 1109, 1114, the Illinois Supreme Court explained that *Zehr* was not an "attempt to prescribe a precise formula for trial judges to use in ascertaining jurors' *** attitudes." In *Emerson*, the trial court did not individually interrogate the prospective jurors on the defendant's presumption of innocence and whether they had any objection to that principle, but had instructed the prospective jurors as a group that the court was the boss of the law, queried whether anyone would refuse to follow the law as given to them, and described the presumption of innocence by giving an explanational hypothetical. Although the *Zehr* questions in issue here are not the same as those at issue in *Emerson*, we also find that the trial court here substantially complied with *Zehr* by instructing the prospective jurors as a group as to defendant's right not to testify and asking the jurors individually as to whether they had a problem following the law.

The case cited by Dukes as analogous to the instant case, *People v. Starks* (1988), 169 Ill. App. 3d 588, 523 N.E.2d 983, is distinguishable. In *Starks*, the court reversed the defendant's conviction for failure to adequately comply with the *Zehr* points concerning the burden of proof, the presumption of innocence, defendant's right not to testify and whether the jurors would hold that against him. The court there gave instructions to the group as a whole as to these points. Unlike the instant case, however, its instructions were given after the jury's impanelment. The *Starks* court emphasized this fact: "[W]hile instructions at the end of trial covered the legal subject matter of the three *voir dire* questions at issue, no preimpanelment question posed to prospective jurors individually or as a group tested them specifically as to their attitude toward defendant's failure to testify." *Starks*, 169 Ill. App. 3d at 593, 523 N.E.2d at 987.

■■■ Addressing the trial errors claimed by Dukes, we consider his contention that the trial court's admission of certain testimony violated his sixth amendment confrontation rights. Although the trials of Dale and Dukes were severed and Dale's statement implicating Dukes was admitted in their simultaneous trials outside the presence of the jury, Dukes argues that three statements made during the testimony of State witnesses, when viewed together, violated the rule

established in *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620. *Bruton* established that a codefendant's sixth amendment right of confrontation can be violated where another defendant's out-of-court admissions that implicate the codefendant are introduced into evidence, even where limiting instructions are given to the jury.

The three statements referred to by Dukes were made in the following contexts. Detective Grefshiem made the first statement during direct examination concerning his investigation of the offenses. Grefshiem stated that he first spoke to Middleton, then brought Dale into the station for questioning, had a conversation with Dale, and next drove to Dukes' home and arrested him.

The second statement was also made by Grefshiem, but on redirect examination. On cross-examination, defense counsel had suggested that Dukes was held after his arrest without reason. Counsel asked, among other questions, why Dukes was held in custody even after he was not identified in the lineups. Upon the State's side-bar request, the trial court ruled that the State could elicit that the detectives were involved in taking the court-reported deposition of Dale on November 8, 1984. Grefshiem thereafter testified over Dukes' objection as to his continued investigation, including the fact that Dale had made a statement and that he was involved in the taking of that court-reported statement.

Assistant State's Attorney Brogan made the third statement in issue during redirect examination. On re–cross-examination, defense counsel asked Brogan if he had checked the facts of Dukes' statement with police reports and other evidence for accuracy. When Brogan queried defense counsel as to what evidence he referred, defense counsel stated "[t]he evidence that was given in the statement." On redirect examination, Brogan then testified over Dukes' objection that, when he took Dukes' statement, he was aware of a statement made by someone else and that he checked Dukes' statement against that statement and found it accurate.

To support his position that these statements together violated his sixth amendment confrontation rights, Dukes cites Illinois cases finding no distinction between the introduction of a codefendant's confession which states the defendant was an accomplice and the introduction of indirect evidence that accomplishes the same. (*People v. Clark* (1959), 17 Ill. 2d 486, 491-92, 162 N.E.2d 413, 417; *People v. Causey* (1984), 127 Ill. App. 3d 1080, 1083, 470 N.E.2d 18, 20.) These cases are inapposite to the case at bar because they involve situations where the jury was indirectly made aware that the defend-

ant was the person whom the codefendant implicated in his statement which had been introduced into evidence. Dale's statement here was admitted outside the presence of the jury, and the testimony of the State's witnesses does not refer to the content of Dale's statement.

Moreover, we need not decide whether an indirect suggestion that the defendant's statement was corroborated by a nonadmitted codefendant's statement, known by the jury to have implicated the defendant, would violate the first defendant's confrontation rights because we do not believe that the three statements here can be found to make such a suggestion. First, only Grefshiem's statement that he had a conversation with Dale and then arrested Dukes even remotely suggests that Dale implicated Dukes in his statement. It has been held, however, that it is proper for a police officer to testify as to the steps taken in an investigation even when the testimony might suggest that a nontestifying witness implicated the defendant. (*People v. Johnson* (1987), 116 Ill. 2d 13, 506 N.E.2d 563; *People v. Dixon* (1982), 105 Ill. App. 3d 340, 434 N.E.2d 369.) Second, Brogan's testimony did not indicate whose statement he checked Dukes' statement against for accuracy. Several State witnesses had given statements to the police during their investigation. The admission of this testimony, therefore, did not violate Dukes' sixth amendment confrontation rights.

We next consider Dukes' contention that the trial court committed reversible error in allowing the rebuttal testimony of a medical intake worker. The State introduced rebuttal testimony, through a stipulation following the court's evidentiary ruling over defense objection, that Watkins, a medical intake worker at Cook County jail, examined Dukes on November 9, 1984, at Cook County jail, that defendant made no complaint of chest pain to him and did not request to see a doctor, and that he would testify that the report made at the time indicated no bruises found on Dukes' body.

■■ Generally, rebuttal testimony is deemed inadmissible where it serves simply to contradict a collateral matter (*People v. Buchanan* (1981), 98 Ill. App. 3d 193, 423 N.E.2d 1333; *People v. Buckner* (1984), 121 Ill. App. 3d 391, 459 N.E.2d 1102), but it will be admitted where the defendant raises an issue in his direct examination, even though it may be collateral to the facts which the State must prove to establish its case (*Buckner*, 121 Ill. App. 3d 391, 459 N.E.2d 1102). The trial court's decision concerning the admissibility of rebuttal testimony is within its sound discretion and should not be reversed absent a showing of abuse of that discretion. *People v. Rios*

(1986), 145 Ill. App. 3d 571, 495 N.E.2d 1103; *Buckner*, 121 Ill. App. 3d 391, 459 N.E.2d 1102.

We find that the trial court did not abuse its discretion in admitting this evidence because Watkins' testimony rebutted a material issue raised by Dukes in his direct examination at trial. On direct examination, Dukes testified that Grefshiem hit him in the chest and that he was forced to sign a confession. He also testified that when he was first admitted to Cook County jail on Friday, November 9, 1984, following his alleged coerced confession, he requested to see a doctor but did not see one until the following Monday. On cross-examination, over Dukes' objection, he admitted that a paramedic examined him, but testified that he complained to him about chest pains. Because Dukes raised the issue of coercion, Watkins' rebuttal testimony was proper to attack his testimony concerning matters relevant to that issue.

We now consider Dukes' contention that he was not proven guilty beyond a reasonable doubt. Dukes argues that since the only evidence linking him to the crime is his confession, which is of questionable validity, it is not sufficient to convict him beyond a reasonable doubt. The record does not support this contention. First, as previously established, Dukes' statement is not of questionable validity. Second, Dukes' statement concerning the details of the incident was corroborated by the physical evidence and by Eddie's testimony. Finally, in addition to Dukes' confession, Middleton's testimony, as well as Dukes' own admission at trial, clearly placed Dukes at the "Your Place Lounge" on the night in question. Moreover, Middleton's testimony also established that Dukes and Dale were seen together leaving the bar shortly before the crimes were committed. This evidence amply supports a finding that Dukes committed the crimes here beyond a reasonable doubt.

As to the last trial error claimed by Dukes, we do not believe the four instances of prosecutor's comments referred to by Dukes denied him a fair trial. Two of these, Dukes argues, were improper statements on facts not in evidence or misstatements of the evidence. While it is improper for prosecutors to misstate the evidence or make argument as to facts not in evidence (*People v. Beier* (1963), 29 Ill. 2d 511, 194 N.E.2d 280; *People v. Giangrande* (1981), 101 Ill. App. 3d 397, 428 N.E.2d 503), the comments in question here, viewed in their entire context, were not improper. The first, the prosecutor's reference to "Eddie Thompson's testimony that Clarence Dukes tied her husband up," did not imply that Eddie identified Dukes. This comment occurred in the prosecutor's discussion

concerning the issue of accountability and Dukes' statement that Dale performed the acts in question. The statement clearly referred to Eddie's testimony as to the acts performed by each of the men. Furthermore, any confusion was obviated by defense counsel's objecting statement that Eddie "never said Clarence Dukes tied anyone up. What she said was some other second person," the court's clarification that "[s]he said the other man," and the prosecutor's corrective statement, "[s]he testified the second man tied her up, and he says he's the second man."

The second situation involving allegedly improper prosecutorial remarks involves the prosecutor's hypothetical cross-examination as to the defense's response had Eddie identified Dukes as the offender. We find the prosecutor's remarks were fair comment on the incredulity of the prior defense argument that the State witnesses were unbelievable and the lack of evidence as to the identity of Dukes as the offender. See *People v. Morando* (1988), 169 Ill. App. 3d 716, 734, 523 N.E.2d 1061, 1074 (prosecutor's comments as to his pretrial thoughts, "what is the Defense possibly going to be," found to be proper expressions of incredulity at prior defense argument).

The two remaining prosecutorial comments, Dukes argues, improperly shifted the burden of proof to him. In commenting on Dukes' testimony, the prosecutor remarked that the defense objected to the State's attempts to question Dukes as to the events occurring on the night of the crimes and that Dukes did not deny his participation in the crimes. It is established that the State may not comment that evidence was not introduced because the defense objected to its introduction. (*People v. Wilson* (1984), 123 Ill. App. 3d 798, 463 N.E.2d 890; *People v. Ray* (1984), 126 Ill. App. 3d 656, 467 N.E.2d 1078; *People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402.) It is equally clear, however, that the credibility of the defendant is a proper subject in closing argument. *People v. Grayson* (1980), 89 Ill. App. 3d 766, 411 N.E. 2d 1177.

The prosecutor also remarked that Dukes' mother did not testify for her son to explain the presence of the suitcase in her home. It is improper for a prosecutor to comment on a defendant's failure to call a witness unless the prosecutor shows the witness is equally available to both parties or the witness is an alibi witness. (*People v. Beller* (1979), 74 Ill. 2d 514, 386 N.E.2d 857.) Although the State argues that this comment was invited by defense counsel's request in argument that the jury send a message to Dukes' family that the liberty of their "son" would not be taken away based upon insufficient evidence, we do not believe the prosecutor's comment was justified by

these defense remarks. Nonetheless, improper remarks generally do not constitute reversible error unless they result in substantial prejudice. (*People v. Sanders* (1988), 168 Ill. App. 3d 295, 522 N.E.2d 715; *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200.) In light of the strong evidence of guilt here, we find the remark to be harmless error.

■■■ Turning to defendants' contentions concerning their sentences, Dukes argues that his sentence should be reversed on grounds that the trial court had the wrong sentencing range in mind. Subsequent to finding Dukes "death eligible" in the first phase of the death-sentencing hearing, the trial court concluded that there were sufficient mitigating factors to preclude the imposition of a death sentence and thereafter sentenced Dukes to an extended term under sections 5—5—3.2(b) and 5—8—2(a)(1) of the Unified Code of Corrections (the Code) (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3.2(b), 1005—8—2(a)(1)). Dukes first asserts that the court had the wrong sentencing range in mind because it found Dukes "death eligible" under the Illinois death penalty statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(d)), which he argues violates the Illinois and United States Constitutions. We need not determine whether the unconstitutionality of the statute would require a reversal under these circumstances, as we are bound by the Illinois Supreme Court's rulings upholding the constitutionality of this statute (*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 397 N.E.2d 809; *People v. Lewis* (1981), 88 Ill. 2d 129, 430 N.E.2d 1346; *People v. Caballero* (1984), 102 Ill. 2d 23, 464 N.E.2d 223; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 475 N.E.2d 840; *People v. Free* (1986), 112 Ill. 2d 154, 492 N.E.2d 1269; *People v. Silagy* (1987), 116 Ill. 2d 357, 507 N.E.2d 830). Although the United States District Court for the Central District of Illinois, in an opinion filed April 29, 1989 (*United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246), has declared the Illinois death penalty statute to be unconstitutional, the Illinois Supreme Court, in subsequent cases affirming death sentences, has noted that it is not bound by this decision because, in passing on Federal constitutional questions, State and lower Federal courts occupy the same position and lower Federal courts exercise no appellate court jurisdiction over State courts. *People v. Del Vecchio* (1989), 129 Ill. 2d 265; *People v. Coleman* (1989), 129 Ill. 2d 321; *People v. Harris* (1989), 129 Ill. 2d 123; *People v. Brisbon* (1989), 129 Ill. 2d 200.

Dukes also asserts that the court had the wrong sentencing range in mind because it incorrectly found Dukes to be "death eligi-

ble," thereby having an erroneous belief as to the maximum possible sentence. It is not necessary that we determine whether the trial court erred in finding Dukes "death eligible" because we find the trial court did not rely on any "death eligibility" standards in imposing Dukes' sentence. The extended-term provisions under which Dukes was sentenced provide that a defendant convicted of murder may be sentenced to an extended term ranging from 40 to 80 years if the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. (Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3.2(b), 1005—8—2.) The trial court specifically found Dukes' conduct to be brutal and heinous and indicative of extreme and wanton cruelty.

Dukes relies solely on a fourth district case, *People v. Hargis* (1983), 118 Ill. App. 3d 1064, 456 N.E.2d 250, to support his position. The defendant in *Hargis* was found to be "death eligible" but was given a natural life sentence under section 5—8—1(a)(1)(b) of the Code (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b)). The court there stated that the trial court's erroneous belief that the defendant could have been sentenced to death required resentencing. We do not adopt this reasoning. *Hargis* relied on *People v. Marquis* (1977), 54 Ill. App. 3d 209, 369 N.E.2d 372, wherein the appellate court remanded the case for resentencing because the trial court erroneously believed the offense to be a "Class A" misdemeanor instead of the correct "Class B" misdemeanor classification, although the sentence imposed fit within the "Class B" misdemeanor sentencing range. In contrast to the *Marquis* court's imposition of a sentence based upon a greater sentencing range, the trial court in the instant case had already determined that it would not sentence defendant under the death penalty statute and looked to other statutory sentencing provisions. Moreover, unlike *Hargis*, where the trial court relied on the factor it erroneously found to make the defendant death eligible in sentencing the defendant under the "natural life" sentence, there is no indication that the trial court in the instant case sentenced Dukes based upon any improper factors.

Dukes next contends that his extended term of 80 years is excessive and unfairly disparate to the extended term of 60 years received by Dale. Although a reviewing court must not defend an arbitrary and unreasonable disparity in sentences between similarly situated codefendants, it should not disturb a sentence where the disparity is warranted by differences in the nature and extent of the defendants' participation in the offense. *People v. Godinez* (1982), 91 Ill. 2d 47, 434 N.E.2d 1121.

While the record shows no significant differences in defendants' backgrounds, it supports the trial court's belief that Dukes participated in the offense to a greater extent than Dale. The court found that Dale was guilty of the murder by accountability and that it was Dukes who personally beat and kicked the 60-year-old victim and tied him in the particular manner that was likely to result in his death. Contrary to Dukes' assertions, the record does not demonstrate that Dale was the instigator. Based upon the record, we find that the trial court did not abuse its discretion in giving Dukes an 80-year extended term and a greater sentence than that given to Dale.

■■■ As to Dale's contention, he argues that his extended term of 60 years for murder and concurrent terms of 30 years for rape, 30 years for home invasion, 15 years for residential burglary, and seven years for robbery are excessive. He asserts that the 60-year extended term does not fairly reflect his degree of fault in the death of the deceased where he was found guilty only by accountability.

It is established that extended-term sentences for brutal and heinous conduct may apply to accomplices as well as principals. (*People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569.) The court here acted under the statutory guidelines in imposing the extended-term sentence. The extended term was proper in view of the brutal and heinous conduct here. Dale was not a passive observer of this conduct. He initiated the contact with the victim, assisted Dukes in obtaining the cord used to tie the victim, and did nothing to stop Dukes as he beat and tied the victim. Thus, we find the trial court did not abuse its discretion in sentencing Dale.

In summary, Dale's sentences are affirmed. Dukes' case is remanded to the circuit court for a *Batson* hearing. Depending upon the outcome of the *Batson* hearing, Dukes' convictions and sentences will be affirmed or he will be granted a new trial consistent with this opinion.

Affirmed in part and remanded with instructions.

MANNING, P.J., and CAMPBELL, J., concur.