THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOHN CASE, Defendant-Appellant.

First District (2nd Division)   No. 1—88—2818

Opinion filed July 30, 1991.—Rehearing denied September 16, 1991.

Randolph N. Stone, Public Defender, of Chicago (James N. Perlman, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Steven M. Mondry, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COCCIA delivered the opinion of the court:

Defendant John Case and a codefendant were indicted for the January 31, 1987, murder of Cheryl Cloud and the related charges of aggravated sexual assault, aggravated criminal sexual abuse, sexual assault, unlawful restraint and, finally, concealment of a homicide. Both defendants moved to suppress inculpatory statements made while in police custody. After a joint suppression hearing, the court denied both defendants' motions. The cases were severed for

trial. Defendant's statements of February 7, 1987, oral and written, were admitted into evidence at his trial.

On August 5, 1988, the jury acquitted defendant of all charges except aggravated criminal sexual abuse. (Ill. Rev. Stat. 1985, ch. 38, par. 12—16(a)(2).) Defendant was sentenced on September 6, 1988, to an extended term of 14 years' imprisonment. The trial court denied defendant's post-trial motion and entered judgment on the jury verdict. On September 16, 1988, defendant filed his notice of appeal.

Defendant's sole issue on appeal is that his oral and written confessions were coerced by a beating he allegedly received from a detective while in police custody. He contends that his conviction should be reversed under *People v. Wilson* (1987), 116 Ill. 2d 29, 506 N.E.2d 571.

## I

In the early morning hours of January 31, 1987, defendant, his girl friend, Georgianna Starr, codefendant Thomas Smith and the deceased, Cheryl Cloud, were drinking wine together while gathered in an alley located near Magnolia Street in Chicago. According to Starr's trial testimony, an argument developed between her and defendant and they started fighting. Defendant knocked Starr to the ground, and she pulled him down with her where they continued to struggle.

Cheryl Cloud intervened. She punched defendant and told him to stop hitting Starr, as he was always hitting her. Starr told defendant that she would tell her brother, Phillip Starr, that defendant was beating her again. About a week earlier Phillip Starr had beaten defendant and told him to stop hitting his sister. When Cheryl Cloud hit defendant, he started hitting her back and Georgianna Starr got up and left, going home to an abandoned building where she and defendant lived. Later that morning defendant woke her up while getting into bed; he said he had been to the bathroom but Starr believed he had been out all night.

Sometime between 2 and 3 p.m. on January 31, 1987, the half-nude, badly battered body of Cheryl Cloud was found behind an abandoned building in Chicago. The body was clutching three strands of long black hair in one hand and had three distinct bite marks on the right facial cheek, left breast, and right breast nipple. There were extensive external injuries to the face, head, neck, eyes, breasts, back and buttocks. There was bleeding found beneath her scalp and over the surface of her brain. There were multiple abra-

sions to her vagina and rectum, both of which reflected the presence of semen. The cause of death was strangulation.

Testimony at the pretrial suppression hearing revealed that on Friday, February 6, 1987, at about 9 p.m., defendant and Georgianna Starr were located by "Area Six" Detectives Sobolewski and Thezan. They accompanied the detectives to the police station. There they were placed in separate rooms for questioning. Defendant appeared to have been drinking; his eyes were glassy, his speech was slurred. Upon arriving at the station defendant was interviewed and denied any knowledge of the Cloud homicide. He said he had been injured in a fight with Phillip Starr, Georgianna Starr's brother, about a week or four days earlier.

Because the circumstances suggested that Cloud had died in a struggle and may have injured her attacker, the detectives noted a bruise and cuts on defendant's right hand, his swollen nose, and scratches on his forehead. At trial, Detective Sobolewski testified that defendant also had bruises on his face. In addition, the detectives noticed that defendant had long, black hair and unusually uneven teeth, and braces. As a result, the detectives sought a forensic odontologist to take impressions of defendant's teeth, and a forensic technician to take samples of defendant's hair, for purposes of comparison with the three strands of hair found in Cloud's hand and the photographs of the bite marks on Cloud's body. Defendant signed forms consenting to these procedures.

Prior to a second interview, defendant was given *Miranda* warnings (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602), and again denied knowing anything about the Cloud homicide. He said he had been drinking with male friends that evening, not with Georgianna Starr. However, Starr told the detectives that she was with defendant that evening but that they had not seen Cheryl Cloud after midnight.

At about 11 p.m. on February 6, after defendant signed the consent to search forms, samples of defendant's hair and photographs of his face and hands were made. Photographs of defendant's mouth and impressions of defendant's teeth and braces were taken by the odontologist, who informed the detectives of his tentative opinion that defendant's teeth matched the bite marks on Cheryl Cloud. He said that additional observations would be made at the lab and they would be contacted the next day. Defendant then surrendered his clothes for examination and was given a paper jump suit to wear.

At about midnight, defendant was interviewed a third time. He again denied involvement in the Cloud homicide. He was then allowed to use the bathroom and was handcuffed to a ring in the wall of the interview room for the night. Detective Sobolewski said that when he left between 1 and 2 a.m., he saw defendant asleep in the interview room.

Detective Wick, at about 5 a.m. on February 7, 1987, saw defendant asleep in a chair in the interview room. At 9:30 a.m., Detective Thiel checked on defendant. Thiel asked defendant if he needed to use the bathroom or wanted anything to eat, but defendant said he did not need anything. At 11 a.m., Wick checked on defendant and received the reply that defendant did not feel like eating.

Defendant testified that he lived mostly on the streets. Defendant was confused as to exactly when on February 6 he came into police custody. He thought he had been in custody about four hours when, after impressions of his teeth were taken, he was arrested and handcuffed to the wall. In his brief, defendant estimates that these events occurred at approximately 1 a.m. on February 7.

In any event, according to defendant, while he was being handcuffed to the wall he requested counsel. In response, a detective with a bushy mustache, later identified as Detective Thiel, hit him several times in the kidneys. According to defendant, over the next 14 hours Thiel beat him several times because he denied involvement in the homicide. Thiel is alleged to have struck defendant three times in the face with the back of his hand. On one occasion Thiel allegedly punched defendant in the left ribs about 10 times, knocking defendant out of the chair even though he was still handcuffed to the wall. Defendant demonstrated this position as having his left hand in the air and being punched in the left side.

On another occasion Thiel allegedly kicked defendant in the side, kicked him in the leg, and threatened or attempted to kick him in the testicles by placing his foot against defendant and pushing hard. In addition, defendant testified that Thiel told him details of the offense in an effort to construct defendant's confession. At one point Thiel allegedly had defendant identify codefendant Smith. When Smith called defendant a liar, Thiel allegedly kicked Smith in the chest and told him to shut up.

Finally, defendant was interviewed by an assistant State's Attorney who told him that he was working with the police. Defendant testified that he signed a statement for the attorney because he thought he would be beaten some more if he did not sign. Defend-

ant was then taken through intake at Cermak Hospital and placed in the jail. Defendant stated that he only received food after the assistant State's Attorney's questioning ended.

On cross-examination defendant described being beaten by Phillip Starr, brother of Georgianna. He said he was knocked to the ground and that the fight happened four days before his arrest. He said Starr pulled his hair and tried to cut his wrists with a razor. Defendant hurt his hand in this fight. Defendant admitted that he drank heavily and that three years earlier he had fallen while drunk and broke his jaw. Defendant stated that he slept in an abandoned building.

At 1:30 p.m. on February 7, 1987, the detectives on duty, Wick, Blomstrand and Thiel, were notified that the hair samples from defendant were consistent with the hair found with the body. Shortly afterward they learned that the dental impressions from defendant's teeth were consistent with the photographs of the bite marks on the body. At about 2 p.m. defendant was interviewed and allegedly stated: "Okay. I'll tell you the truth," and made an oral confession implicating himself and the codefendant, Thomas Smith, in the Cheryl Cloud homicide. At about 3:30 and 4:30 p.m. on February 7, the detectives checked on defendant, and brought him a sandwich, cigarettes and a soda.

Later, at about 8:30 p.m., defendant made an oral statement to Assistant State's Attorney Rich Stevens, who then made a written summary. Stevens asked Thiel to step out of the room momentarily and asked defendant about his treatment by the police. Defendant did not tell Stevens about the beatings. Stevens testified that defendant said the police had treated him well. Defendant answered "No" when asked if he had been struck, threatened, or coerced, or promised anything in any way. Defendant testified that he was told by Stevens that Stevens worked for the police and so he was afraid to tell Stevens about the beatings.

On February 8, 1987, defendant was examined at Cermak Memorial Hospital by Robert Hradek as part of the jail intake processing. Defendant removed his shirt so Hradek could observe him from the waist up. Hradek filled out a body chart which depicted diagrams of four human figures showing the front, back, left, and right sides of a human body. Hradek marked only the front and back figures, using numbers corresponding to a key on the chart. Hradek noticed no bruises but did notice that defendant had five tattoos on his arms and shoulders and a bandage on his right wrist covering his thumb. Defendant told him that he had injured his

thumb in a fight four days earlier. Defendant also had scars on his face, above his heart, and under his left armpit, and on the back of his right wrist, all of which appeared to Hradek to have been there for a while. Hradek placed a mark in the area of the scapula on the back view, indicating a scar. Hradek did not mark either the figures for the left or right side views at all. Defendant did not complain to him about any beating by the police detectives. Defendant testified that he said nothing about the beating to Hradek because he thought he was working with the police.

At trial Hradek testified that he saw old bruises on defendant and that he recorded this on the body chart on the figure showing the back view of a person but that he marked the area as a scar, not as a bruise, because it was well healed. Hradek testified that he saw no fresh bruising on defendant's body. He estimated the bruises/scars were over a week and maybe a month or two months old.

Dr. Mohamed Salem, a third-year medical resident, was the intake physician at Cermak Hospital. He examined defendant's heart, chest and abdomen, but his report made no mention of any bruising. Dr. Salem did not testify at trial. However, at the suppression hearing, Dr. Salem testified that he had seen old bruises on the left side of defendant's chest and had not recorded them because Hradek's chart had already done that. He referred to the mark under the left scapula on the chart (indicating a scar) which showed an area of the bruising he saw. Over objection, Dr. Salem stated that the bruises appeared about three days old. Dr. Salem agreed that he was not an expert and could not determine the exact age of a bruise with the same precision as an expert. Defendant did not complain to him of any pain regarding those bruises nor did he complain about being beaten by the police. Defendant testified that he did not tell Dr. Salem about the beating or complain about his bruises because he thought Salem was working with the police. Salem referred defendant to the emergency room because defendant's hands were shaky and he felt defendant was suffering from alcoholic withdrawal.

Detectives Sobolewski, Thezan, Wick, Blomstrand and Thiel all testified at the suppression hearing that no one beat or threatened defendant in their presence. Nor did defendant ever complain to them of any beating or threats.

On February 9, 1987, defendant was arraigned. An investigator from the public defender's office, George Brobst, took 10 photographs of defendant at about 2 that afternoon. Eight of those pho-

tographs were admitted into evidence at the suppression hearing. (Enlargements of three were admitted at trial, showing left side bruises.) Two of the remaining five pictures showed an abrasion to the inside of defendant's left upper lip. These injuries were attributed by defendant to the beating he allegedly received from Detective Thiel. Other photographs showed injuries on defendant's left wrist. Defendant attributed these injuries to having been kicked out of the chair by Thiel while he was chained to the wall. Some of the photographs were not available at trial, resulting in the court hearing testimony from Brobst and using photocopies of the missing original pictures.

At the conclusion of the suppression hearing, the trial court ruled that defendant did not clearly establish that he received any injuries while in police custody. The court referred to the defendant's testimony that he had recently fought with Phillip Starr, that he was a heavy drinker and lived on the streets. The court relied upon the photographs of defendant made at the time of his arrest on February 6 and concluded that they supported the view that defendant had received his injuries by means other than police coercion. The court specifically rejected defendant's testimony asserting that he was beaten by police. The court found that in the totality of the circumstances, defendant's statements were made freely, knowingly and voluntarily. In the alternative, the court found that even if defendant's injuries had been sustained during his custody by the police, the State had established by clear and convincing evidence that the injuries were not the product of police misconduct.

## II

For a confession to be admissible in evidence, the trial court must determine that it was made voluntarily without compulsion or inducement. (*People v. Gholston* (1984), 124 Ill. App. 3d 873, 464 N.E.2d 1179; *People v. Jones* (1989), 184 Ill. App. 3d 412, 541 N.E.2d 132.) The standard of voluntariness requires a knowing, intelligent and voluntary decision to confess. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508. See also *People v. Bernasco* (1990), 138 Ill. 2d 349, 562 N.E.2d 958.) A confession is voluntary if, based on the totality of the circumstances, the accused's will was not overborne at the time he confessed; the confession must be the product of a rational intellect and a free will. *People v. Kincaid*, 87 Ill. 2d at 117, 429 N.E.2d at 511; *People v. Jones* (1990), 196 Ill. App. 3d 937, 957, 554 N.E.2d 516, 528.

When a defendant challenges the admissibility of his confession, the State has the burden to establish by the preponderance of the evidence that the confession was voluntary. (Ill. Rev. Stat. 1989, ch. 38, par. 114—11(d); *Lego v. Twomey* (1972), 404 U.S. 477, 489, 30 L. Ed. 2d 618, 627, 92 S. Ct. 619, 627; *People v. Caballero* (1984), 102 Ill. 2d 23, 33, 464 N.E.2d 223, 227.) On a motion to suppress it is the trial court's duty to resolve conflicting evidence and determine the credibility of the witnesses. *People v. Jones,* 184 Ill. App. 3d at 423, 541 N.E.2d at 140; *People v. Clark* (1986), 114 Ill. 2d 450, 501 N.E.2d 102.

A reviewing court will not reweigh the evidence as if it were a trial court and will not disturb the trial court's determination of a motion to suppress evidence unless that finding is against the manifest weight of the evidence. (*People v. Bernasco* (1990), 138 Ill. 2d 349, 562 N.E.2d 958; *People v. Galvin* (1989), 127 Ill. 2d 153, 162, 535 N.E.2d 837, 841.) Thus, a trial court's findings as to voluntariness will not be reversed unless they are against the manifest weight of the evidence. (*People v. Caballero,* 102 Ill. 2d at 33, 464 N.E.2d at 228; *People v. King* (1986), 109 Ill. 2d 514, 488 N.E.2d 949.) Of course, the reviewing court is required to defer to the findings of the trial court where that court has assessed credibility, demeanor, and all relevant facts. (*People v. Reid* (1990), 136 Ill. 2d 27, 56, 59, 554 N.E.2d 174, 187, 188-89.) The reviewing court is not limited to the evidence presented at the motion to suppress but also may consider the evidence adduced at trial. *People v. Caballero,* 102 Ill. 2d 23, 464 N.E.2d 223.

■ In the case at bar the trial court found that defendant's confessions met the above standards and were admissible. The trial court rejected defendant's argument that the rule of *People v. Wilson* (116 Ill. 2d 29, 506 N.E.2d 571) applied. In *Wilson,* the supreme court said:

> "[W]hen it is evident that a defendant has been injured while in police custody, the State must show, by clear and convincing evidence, that the injuries were not inflicted as a means of producing the confession. [Citations.] This requires more than the mere denial by the State's witnesses that the confession was coerced." (116 Ill. 2d at 40, 506 N.E.2d at 575.)

The *Wilson* rule applies where it is conceded or is clearly established that the defendant received injuries while in police custody. (*People v. Dale* (1989), 189 Ill. App. 3d 704, 545 N.E.2d 521, citing *People v. La Frana* (1954), 4 Ill. 2d 261, 267, 122 N.E.2d 583, 586.)

In *People v. Wilson* the court applied the rule where the State argued that any injuries sustained by the defendant were received after he had confessed. In the case at bar there is a factual conflict presented over whether defendant sustained the injuries in question before or after he was taken into custody by the police on February 6, 1987.

We do not automatically require the State to prove voluntariness by clear and convincing evidence whenever there is a factual conflict as to when alleged injuries occurred. To do so would seriously distort the true purpose of the rule. The rule was intended for factual situations in which there was "little question" (*People v. Thomlison* (1948), 400 Ill. 555, 562, 81 N.E.2d 434, 438) that the defendant was assaulted after he came into police custody but the sole witnesses to the custody, usually police officers, deny any knowledge of how the defendant sustained his injuries. Under the usual standard for proving voluntariness, *i.e.*, by the preponderance of the evidence, such passive denials may allow the State to prevail without proving the actual circumstances of the confession. Deeming the preponderance standard to be inadequate, the *Wilson* rule replaced it with the clear and convincing evidence standard. The predicate necessary for applying the higher standard of proof, however, is the threshold showing that the defendant received his injuries after coming into police custody.

In *People v. Davis* (1966), 35 Ill. 2d 202, 206, 220 N.E.2d 222, 225, the defendant complained to the jail intake doctor that he had pain in his chest and arms and that he had been beaten by the police. The doctor examined the defendant and concluded that the injuries, bruises and discolorations were the result of trauma. The official jail records reflected the doctor's testimony. Despite the denials by the officers of any wrongdoing, our supreme court stated that there was no evidence in the record tending to explain the injuries on any basis other than police brutality, and reversed the conviction.

In the case at bar the trial court held that it had not been clearly established that defendant was injured after coming into police custody. In so ruling, the trial court reviewed the photographs of defendant made on February 6 by the police, as well as the February 9 photographs produced by the public defender's investigator. The enlargements of the latter photographs were viewed at trial by the court. The trial court did not credit defendant's testimony that he had been beaten by the police. Finally, the court considered that the absence of any complaint by defendant to the assistant State's

Attorney, or to Hradek, or Dr. Salem, was strong evidence that defendant had not been beaten by the police. It is not clear what weight, if any, the trial court gave to the body chart or Hradek's or Salem's testimony concerning their observations of defendant on February 8, 1987. Given defendant's testimony about a prior fight, and the lifestyle he lived, however, the trial court concluded that there was a basis other than police brutality to explain defendant's injuries.

In *People v. Dale* (1989), 189 Ill. App. 3d 704, 717, 545 N.E.2d 521, 529, a doctor testified to certain chest injuries sustained by the defendant, which defendant claimed resulted from a beating by the police to induce his confession. Defendant failed to complain to the assistant State's Attorney, the court reporter, or jail intake personnel about being beaten or about his alleged injuries. The jail intake technician completed a body chart of defendant without indicating any chest bruises or injuries. We held that this evidence sufficiently supported the trial court's findings that defendant had confessed without being beaten by the police. By contrast, in *People v. Banks* (1989), 192 Ill. App. 3d 986, 992, 549 N.E.2d 766, 770, we reversed a conviction where the defendant complained to a doctor at Cermak Hospital that he had been beaten and a bag had been placed over his head, and the injuries sustained were identified by the doctor as consistent with those claims.

We do not conclude that a defendant's failure to report the fact of an alleged beating by police is necessarily dispositive of the factual question whether he has been beaten while in police custody. The trial court must also consider the defendant's explanation for any lack of complaint when circumstances would make it natural to make one. However, here the trial judge concluded that defendant's failure to complain was evidence that he was not injured while in police custody, despite his explanation for not voicing any complaint. In addition, the trial court concluded that defendant had not met his burden to show that his injuries had occurred while he was in police custody because there were alternative explanations pointing to preexisting injury. The trial court's conclusion is subject to review under an abuse of discretion standard. *People v. Hooper* (1989), 133 Ill. 2d 469, 497, 552 N.E.2d 684, 695.

In the *Hooper* case our supreme court concluded that there was no abuse of discretion by the trial court where it found that the defendant had failed to show his injuries occurred while he was in police custody. There, the defendant testified that he was beaten in the police squad car at the time of his arrest. He said he was then

taken underneath a viaduct, removed from the car and knocked onto the ground and questioned with a shotgun to his head. He said his right leg was twisted, causing pain. (133 Ill. 2d at 484, 552 N.E.2d at 689.) The supreme court held that the trial court did not abuse its discretion because the marks of blows to the defendant's head were not visible in photographs taken on his arrest and his general appearance was not that of one thrown to the ground. An infected cut on defendant's ankle could have been received as long as five days before his arrest or might not have been the same as the wound on his right leg, which was shown to the jury. *People v. Hooper*, 133 Ill. 2d at 497, 552 N.E.2d at 695.

■ In the case at bar we conclude that the trial court did not abuse its discretion in ruling that defendant had failed to establish that he incurred injuries while in police custody.

The defendant argues that the February 9 photographs of his torso and face (an abrasion to the inside of his upper left lip) clearly require the opposite conclusion, *i.e.*, that the injuries he received, especially bruises to his left side, were administered during police custody and, specifically, while his left arm was chained to the wall of the interrogation room. We have viewed the photographic trial exhibits, including the enlarged photographs of defendant's left side. We note that the trial judge also viewed these exhibits at trial, as well as the original photographs at the suppression hearing. At trial the judge did not alter his decision to admit the confession based on the enlarged photographs, nor can we say that they clearly show injuries that must have occurred during police custody and not before.

Defendant argues that he surrendered his clothing to the police on February 6 but they made no notation at that time of such bruises. Defendant points out that the police were attentive to his other injuries (on his hands and face), and the possibility that he had sustained them in the struggle with the deceased. Therefore, he argues, the police would have noticed the injuries on his torso had they been there on the evening of February 6. We are not persuaded by this argument, as the police were initially looking at injuries on defendant's face and hands, and it is not established that when he changed into the paper suit he was being watched by the officers.

Furthermore, defendant's own testimony, consistent with his initial statement to the police, was that he was beaten four days before February 6 by his girl friend's brother. Subsequent trial testimony by Georgianna Starr lends further substance to the possibility

that this beating was the source of the injuries to defendant's mouth and torso. Starr testified that her brother had administered a beating to defendant about a week before January 31. The reason for the beating was that defendant beat Georgianna Starr and her brother retaliated in her defense. On January 31, Starr and defendant fought again, and she threatened to tell her brother. While it is by no means conclusive proof of the event, Starr's trial testimony offers at least circumstantial corroboration that defendant was beaten by Phillip Starr four days before February 6. As defendant both admitted as much to the detectives and, in part, to Hradek, as well as testified under oath to the same matter at the suppression hearing and at trial, we must conclude that there is an evidentiary basis to support the trial court's conclusion that a prior fight could have accounted for the injuries defendant sustained.

■ Defendant argues that we are compelled to reverse the trial court because of our decision in *People v. Smith* (1989), 197 Ill. App. 3d 226, 554 N.E.2d 263, where we reversed the trial court's suppression ruling in the codefendant's case, applying the *Wilson* doctrine. For a number of reasons, we disagree. We conclude that *People v. Smith* is distinguishable from the case at bar, as we specifically held that Smith had met his initial burden of persuasion that he was injured while in police custody. (*People v. Smith*, 197 Ill. App. 3d at 231, 554 N.E.2d at 265.) By contrast, defendant John Case has not demonstrated that his injuries were sustained while in police custody rather than prior to that custody.

In Smith's case the evidence showed that he had but one minor bruise on his inner bicep at the time he was taken into custody on February 7. The evidence also showed that Smith sustained a split lip and bruises on his right shoulder, right side, and lower right back. The jail intake technician in that case was someone other than Hradek, and she testified that she had no independent recollection of examining Smith and did not require Smith to disrobe for the examination. We also noted that the technician's report contained an obvious error in asserting that it was made at a time when it was impossible for Smith to have been present. The technician's testimony was based solely on her report. Finally, neither the police officers nor the assistant State's Attorney could explain how Smith received his injuries and a witness, the codefendant's girl friend, corroborated his lack of injury at the time of his arrest. *People v. Smith*, therefore, is distinguishable as it was based on a record containing undisputed evidence that Smith was injured while in

police custody and no evidence whatever to support a contrary finding.

We have reviewed the exhibits defendant has placed in the record. We do not, of course, substitute our judgment for that of the trial court or merely reweigh the evidence. (*People v. Jones* (1989), 184 Ill. App. 3d 412, 425-26, 541 N.E.2d 132, 140.) We find that the manifest weight of the evidence does not require a contrary conclusion to that reached by the trial court. (*People v. King* (1986), 109 Ill. 2d 514, 526, 488 N.E.2d 949, 955.) Therefore, we conclude that the trial court did not abuse its discretion in declining to apply the doctrine of *People v. Wilson* in this case. In all other respects we affirm the trial court's ruling that the confession was voluntarily and intelligently obtained. *People v. Bernasco*, 138 Ill. 2d at 358-60, 562 N.E.2d at 962-63.

In light of our decision to affirm the trial court's ruling admitting defendant's confession, we find it unnecessary to decide the State's claim that, in any event, the harmless error rule would require affirmance of defendant's conviction.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

SCARIANO, P.J., and DiVITO, J., concur.