THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ADAM BARRAGAN, Defendant-Appellant.

First District (5th Division)    No. 1—90—3119

Opinion filed December 10, 1993.

Robert L. Rascia and Donald J. Angelini, Jr., both of Rascia & Rascia, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan R. Schierl, and Laura Bertucci, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

Defendant Adam Barragan was indicted for murder (720 ILCS 5/9—1 (West 1992)). After a jury trial by the circuit court of Cook County, defendant was convicted and sentenced to 40 years' imprisonment. The trial began on September 25, 1990. Defendant's motion for a new trial was denied by the court. A timely notice of appeal was filed.

Defendant requests that his conviction be reversed and the cause remanded for a new trial, or, in the alternative, that this cause be remanded for resentencing. Defendant makes four arguments: (1) the trial court improperly denied the defendant's motion to suppress confession where, defendant claims, the confession was the product of police brutality; (2) the evidence, exclusive of the defendant's supposedly involuntary confession, was insufficient to sustain a conviction; (3) the court denied the defendant the right to a trial by a fair and impartial jury; and (4) the trial court imposed an excessive sentence.

Prior to trial, defendant filed a motion to suppress his confession regarding his involvement in the shooting of Domaciano Yriarte. Defendant's motion alleged that he was struck during questioning and received an eye injury. During the motion, Officers Fernando Alonzo and George Parker testified that on July 27, 1989, at approximately 7:30 p.m. while on patrol, they received a call of a man shot at 2601 West Cullerton Avenue in Chicago. Once at that location, they obtained a description of the offender and began to investigate the area. Approximately 45 minutes later, the officers saw an individual who matched the description of the shooter near 1800 South California, about three blocks from the area of the shooting. "Chavo" was tattooed on the individual's stomach. The officers stopped the individual, conducted a field interview, and then continued to search the area.

Several hours later, the officers were informed that the name of the offender was Chavo. Upon receiving this information, the officers returned to 1800 South California and asked defendant, the man they had spoken to earlier, to come to the station for questioning. The officers handcuffed defendant, placed him in the police car, and advised him of his *Miranda* rights, which defendant stated he understood. At that time, defendant told the officers that he did not do anything. Defendant's brother followed them to the police station.

Once at Area 4 police headquarters, defendant was placed in an interview room. The arresting officers testified that defendant did not ask for an attorney. The officers testified that they did not threaten or beat defendant, nor did they see any other officer hit defendant. On cross-examination, Officer Alonzo stated he did not remember whether defendant had any cuts or bruises. Officer Parker stated he did not notice whether defendant had any cuts, bruises or swelling on his body. After completing an arrest report, the officers turned defendant over to Detectives Bronsberg and Miller and had no further conversations or contact with defendant.

Both Detectives Mike Miller and Greg Bronsberg were assigned

to investigate the homicide of the victim. Detective Miller testified that he spoke with defendant in an interview room at Area 4 police station. The detective testified that he advised defendant of his *Miranda* rights and that defendant stated that he understood them. According to Miller's testimony, after the detective informed defendant that he had been identified by certain witnesses, defendant told the detective about his involvement in the shooting. Detective Miller testified that defendant did not ask to speak to a lawyer or to make any phone calls; that he (Miller) did not hit defendant and did not see anyone else hit defendant. After the conversation with defendant, the detective notified the felony review unit of the State's Attorney's office.

Detective Miller further testified that once Assistant State's Attorney Jerome Marconi arrived at the station, he interviewed defendant. Detective Miller was present during the interview. Marconi again informed defendant of his *Miranda* rights. At that time Marconi and defendant had a conversation about the shooting. Subsequently defendant's statement was reduced to writing by Marconi. Defendant read and signed the statement.

According to Detective Miller's testimony, the assistant State's Attorney did not physically abuse defendant in his presence. Miller testified that defendant did not complain about any injuries or that he had been beaten and did not ask the assistant State's Attorney for any medical attention.

During cross-examination and redirect examination, Detective Miller stated that he did not notice a cut or a band-aid over defendant's left eye. When shown defendant's exhibit No. 2, a photograph of defendant when he was admitted to Cook County jail, Miller indicated that he did not know when the photo was taken, but that over defendant's eye, there was a band-aid which was the same color as defendant's skin.

Detective Bronsberg testified that he never had any conversations with defendant. He did see defendant while he was at Area 4 headquarters; however, the detective claimed he never noticed anything unusual about defendant. Miller's testimony was that he did not see any bleeding or bruises on defendant. He never struck defendant and he did not see anyone else hit defendant. Further, he did not hear defendant ask for medical attention or to make a call.

Marconi testified that after he spoke with the witnesses and surveyed the crime scene, he spoke with defendant. While Detective Miller was present, Marconi advised defendant of his *Miranda* rights and informed him that he had spoken with the witnesses about defendant's involvement in the shooting. According to Marconi's

testimony, defendant stated that he was sorry and that he did not mean to shoot the old man. After the detective left the room, Marconi and defendant went through all the facts of the occurrence. Marconi also asked defendant if the police had been treating him okay, if they allowed him water, and if they allowed him use of the bathroom. Miller testified that defendant answered affirmatively and never complained about any physical abuse.

Assistant State's Attorney Marconi did notice the band-aid over defendant's eye. However, he testified that he saw no bleeding, swelling or bruises on defendant's face or body. He asked Detective Miller outside defendant's presence how defendant acquired the injury. According to Marconi's testimony Miller's explanation for the band-aid was "that he got it on the bike during the incident." Defendant denied that he told Miller his eye injury was caused by falling off his bicycle. Rather, he testified, he received the injury from Detective Miller. Defendant stated he was told by Miller not to tell the State's Attorney or anyone else about the beating he had received.

After Marconi reduced defendant's statement to writing, he and Detective Miller returned to the interview room. Marconi testified that defendant read the statement and was able to make changes. Defendant signed each page of the statement. Marconi prepared a memo which he submitted to his supervisor.

On cross-examination, Marconi stated that the written statement did not mention the band-aid above defendant's eye or the incident concerning defendant's bike. Further, the statement did not include anything concerning the police treatment of defendant. However, all of this information was included in the memo which the assistant State's Attorney had written to his supervisor.

Defendant presented two witnesses during the suppression hearing. Willie Kirkwood and Libby Stewart testified that they were standing outside defendant's house when he was taken to the police station. They both testified that defendant did not have any cuts or bruises and he did not have a bandage on his head.

Defendant testified that after he was arrested, he was taken to the police station and placed in an interview room where he was handcuffed to the wall. Defendant stated that Detective Miller entered the room on three separate occasions and asked him about the murder. According to defendant, when he told the detective that he did not know anything about the shooting, the detective would hit him. The detective hit him in the face with both an open hand and a fist. At one time, defendant said the detective hit him over his left eye and caused him to bleed down his face. The third time the detective entered the room, the detective unhandcuffed defendant

and knocked him to the floor, where he punched and kicked him in the stomach and the face. Defendant stated that he was given a wet tissue and a band-aid for a cut on his face. He also used his shirt to wipe the blood off his face. Defendant further stated that once he was taken to jail he received a new band-aid and his shirt was thrown out because they were both soaked with blood.

Defendant testified that he made a statement to Detective Miller because he was afraid Miller would continue to beat him. According to defendant, the detective even threatened to kill him if he did not make a statement. Miller also told defendant not to tell the assistant State's Attorney what he had done. Defendant testified that Miller told him he had "better answer what the State's Attorney wants [him] to answer." Defendant said these threats explain why he never told the assistant State's Attorney that the detective had hit him and why he signed the statement.

On cross-examination, defendant testified that he never asked for medical attention because of the beatings. He never told the assistant State's Attorney that he had been beaten even though the detective was not present during their entire conversation. Further, defendant never told the lockup officer about the abuse after he was removed from the interview room and placed in lockup.

Officer Leo Panepinto testified that he was assigned to the lockup during the time defendant was at the police station. On his report from that day, he checked the box which read "arrestee had obvious pain." However, he wrote on the report "cut over eye, previous injury." According to the officer's testimony, a "previous injury" is an old injury, one that is not fresh. He further testified that when an offender is taken into the lockup, he is examined and sent to the hospital if he has any new injuries. If defendant's band-aid had fresh blood or if it had blood seepage, the officer would have sent him to the hospital. However, the officer's report indicated that defendant was not sent to the hospital.

Finally, Clarence Spivey testified that he is an emergency medical technician at the Cook County jail. He examined defendant when he was initially brought to the jail. The report of his examination indicated that defendant had a band-aid over his eye and it read "trauma to left eye." Spivey asked defendant a series of questions which were preprinted on his report form. When asked if he had any eye problems or head injuries, defendant responded negatively. Defendant also told Spivey that he was in good health. Spivey said he did not see any swelling or bruises on defendant. He never looked under defendant's band-aid and did not give defendant a new bandage because he did not see any blood on the old one. Spivey testified that

defendant did not complain that he had been beaten by police. At the conclusion of all the evidence and following arguments on the motion, the court denied defendant's motion to suppress statements.

At trial, Gabriel Gamez testified that on July 27, 1989, about 5 p.m., he was at the corner of Cullerton and Washtenaw. He noticed a car driving north on Washtenaw, which is a southbound, one-way street. A young man was driving the car with a female passenger. Standing on the street were two men who Gabriel knew were members of the Cullerton Deuces gang. As the car passed these two men, the driver made a hand signal which represented the Disciples gang, which was a rival gang to the Deuces. At that moment, one of the Cullerton Deuces threw a bottle at the moving car, hitting the female passenger in the head. The driver yelled that he was going to come back as he drove away.

Daniel Roncone testified that later that evening, around 7 p.m., he and a friend were walking in the alley between Cullerton and Washtenaw when they saw members of the Cullerton Deuces gang running towards 21st Street. Roncone was familiar with the area gangs since he had lived in the neighborhood for about $2^1/2$ years. As they continued to walk towards the parking lot on Cullerton, Roncone heard someone yell, "Deuces Killer." He turned and saw defendant along with another guy, Franky, both riding on a bicycle. They were yelling, "Deuces Killer." They were riding in Roncone's direction when he saw that one of them was holding a gun. Roncone testified that he thinks Franky began shooting at him while defendant ran towards Cullerton Avenue. When Roncone saw the gun, he "ran for his life" and he and his friend hid behind a garbage dumpster. After a bullet hit the garbage can next to Roncone and his friend, Franky began to chase them around the dumpster. Roncone testified that while Franky was shooting at them, he heard other shots in the distance. Roncone and his friend ran and hid in a nearby garage. Franky began to follow them, but finally turned and ran through the parking lot toward Cullerton Avenue. Daniel could still hear shots being fired as they hid in the garage.

Arturo Calvillo testified that he lived at 2635 West Cullerton, next to the empty lot. At approximately 7 p.m. on July 28, 1989, he heard the shots being fired in the alley behind his house. When he ran outside, he saw defendant standing outside his house holding a chrome gun in his right hand. Calvillo testified that he had previously been a member of the Cullerton Deuces and he knew that defendant was a member of the Disciples gang. Calvillo testified that defendant fired the gun toward a "fat guy," who was standing across the street and a few houses down from Calvillo's house. Calvillo saw the "fat

guy" run across the street and hide behind a tree in front of Yriarte's house on the corner of Cullerton and Rockwell. Calvillo testified that defendant crossed the street, looking for the "fat guy." Defendant fired a few more shots, but when he was unable to find the "fat guy," he turned and walked toward Washtenaw. Defendant stopped in front of Calvillo's house where Calvillo testified he thinks defendant reloaded his gun. Then defendant walked to the corner of Cullerton and Washtenaw. At that time, Calvillo's father pulled him back into the house. Once inside Calvillo heard more gunfire coming from the direction of Rockwell Avenue.

Gabriel Gamez further testified that around 7 p.m., he was again on Cullerton Avenue at the victim's house helping him unload sand for a neighborhood sandbox. As he unloaded the sand, Gamez saw the car he had seen earlier. Defendant and two other men got out of the car near Calvillo's house. Gamez knew defendant was a member of the Disciples gang and he had previously seen him in the neighborhood fighting with members of the Deuces. Defendant was carrying a gun which he started to shoot at four Cullerton Deuces who were standing by the parking lot on Cullerton. According to Gamez's testimony, the Cullerton Deuces did not have any weapons. Gamez could hear defendant yelling, "Deuces Killer."

Corroborating Calvillo's testimony, Gamez testified that when defendant saw the "fat guy" running down the street, defendant turned and started firing towards him. The "fat guy" did not have a weapon either, according to Gamez. Defendant continued to shoot at him as he yelled "Deuce Killer, Disciple Love." When the "fat guy" hid behind a tree, defendant disappeared down Washtenaw Street.

Gamez testified that two or three minutes later, defendant and another person returned on a bicycle. Defendant was still carrying a gun, and the other person had a rifle. Defendant again started to shoot at the "fat guy," who was now standing in front of the victim's house. Both Gamez and the victim were still in the victim's yard. The victim's son was also in the yard near where the "fat guy" was standing. When defendant returned and began to shoot at the "fat guy" again, the victim ran over to try and move his son out of the line of fire. However, one of defendant's bullets hit the victim directly in the chest. As the victim fell to the ground, defendant continued to fire at the "fat guy." Gamez never saw anyone fire a weapon at defendant. Finally, when the person on the bike yelled "Chavo," defendant ran toward the Cullerton alley, slipping as he ran away.

On cross-examination, Gamez stated that he never told police about the earlier incident involving the car and the brick. He further stated that when he initially heard the shots fired while he was at

the victim's house, he could not identify the source. However, he knew they came from the western part of the street. Once the shooting stopped, Calvillo returned to the scene and Roncone ran from the garage to see what had happened. They both saw the victim lying on the ground.

Alicia Rodriguez testified that the victim was her son-in-law. On the day of the shooting, she was inside the building that the family shared at Cullerton and Rockwell when she heard gunfire. She testified that she ran to the porch and saw some boys running through the alley. She called the police and ran to the corner to find the victim lying in the street, shot in the chest.

Officer Gilberto Espinosa was dispatched to the 2600 block of Cullerton as a result of the shooting. When he and his partner first arrived at Cullerton and Washtenaw, the officer saw two Hispanic men fleeing on foot. Officer Espinosa chased one of the men, but was unable to apprehend him. The officers then continued to Cullerton and Rockwell, where they found the victim lying in the street. They called an ambulance and started to talk to people on the street. They transported witnesses Gamez and Roncone to Area 4 police headquarters and sent another unit to pick up the witness, Calvillo. Officer Espinosa then prepared a case report which he gave to the sergeant. At that time, he placed over the radio a description of the person he chased when he first arrived on the scene. Finally, the officer spoke with the witnesses at the station and learned that the name of the offender was "Chavo."

Officer Fernando Alonzo testified that he responded to the radio call of a man shot at Cullerton and Washtenaw. Once at the location, the officer learned that the offenders were two Hispanic men wearing T-shirts and cut-off shorts. Officer Alonzo and his partner toured the area for suspects. After further learning that the offenders had been seen on a bicycle, the officers stopped an Hispanic man who was carrying his bike about four blocks from the shooting. The person had "Chavo" tattooed on his chest. After he stated he knew nothing about the shooting, the officers continued with their investigation.

Officer Alonzo testified that about two hours later, he and his partner were informed that a possible name for the offender was "Chavo." They returned to the area where they had earlier spoken with defendant, brought him to the Area 4 station, and turned him over to Detectives Bronsberg and Miller. Officer Alonzo testified that he did not remember seeing a small, skin-toned band-aid over defendant's left eye. He testified that the area of 18th Street and California, where defendant lived, is the territory of the Satan Disciples, a rival gang of the Cullerton Deuces.

When initially assigned to the shooting, Detectives Bronsberg and Miller spoke to the witness, Daniel Roncone, who named "Chavo" as the offender. According to Bronsberg's testimony, the detectives then went to the scene of the crime and retraced defendant's steps. Detective Bronsberg located the dumpster in the alley where Roncone stated he hid from the gunfire. The dumpster was covered with bullet indentations. The detective also found, near the dumpster, spent casings and bullets which appeared to be .45 caliber. After investigating the scene, Detective Bronsberg returned to Area 4 and interviewed the other witnesses, Gamez and Calvillo. Bronsberg testified that both indicated that "Chavo" was the shooter. However, unlike Gamez, neither Calvillo or Roncone ever told Bronsberg that he actually saw defendant shoot the victim.

According to the statement that Marconi reduced to writing and defendant read and signed, defendant's friend Franky and his girl friend were driving on Cullerton Avenue near Rockwell when someone from the Deuces street gang threw a bottle at his car, hitting Franky's girl friend in the head. Later, Franky and defendant decided to return to the area and shoot a Deuce. Defendant and Franky brought a bike with them and hid it in the Cullerton alley. In the alley they saw a person who they thought was a Deuce. Defendant pulled out a .45-caliber semi-automatic gun and began firing at the person. However, the person hid behind some garbage cans. Defendant then ran through a vacant lot on Cullerton and stopped in front of a house. Defendant fired a few more shots down Cullerton towards people who were standing at Rockwell and Cullerton. Defendant returned to the alley and met Franky. They both rode the bike north on Rockwell. When defendant passed an older man who was standing near the corner at Cullerton, he heard someone yell derogatory Disciples slogans. Defendant turned and saw a person throw a gang signal at him, so he fired several shots. However, the older man fell to the ground.

Robert Kirschner testified that he is the deputy chief medical examiner for Cook County. Dr. Kirschner examined the autopsy report of the victim which was completed by Dr. Jumbelic. According to the report, the victim had a single through-and-through gunshot wound to the chest which passed through his lung, heart and aorta. Victim's cause of death was the gunshot wound.

Following closing arguments, the jury found defendant guilty of murder. After denying defendant's motion for a new trial, the court heard evidence in mitigation and aggravation. Following these arguments, defendant was sentenced to 40 years in the Illinois Department of Corrections. Defendant now appeals his conviction and sentence.

Defendant contends on appeal that the trial court improperly denied defendant's motion to suppress where, defendant claims, his confession was not voluntary. It is for the trial court to judge the voluntariness of a confession and, thus, its admissibility. (*People v. Hooper* (1989), 133 Ill. 2d 469, 552 N.E.2d 684.) The test is whether the statement was made freely and without compulsion or whether the defendant's will was overborne at the time so as not to be the product of a rational intellect and free will. (*People v. McCleary* (1990), 208 Ill. App. 3d 466, 567 N.E.2d 434.) Under ordinary circumstances, the voluntariness of a confession only needs to be established by a preponderance of the evidence. (*Lego v. Twomey* (1972), 404 U.S. 477, 30 L. Ed. 2d 618, 92 S. Ct. 619; *People v. Case* (1991), 218 Ill. App. 3d 146, 577 N.E.2d 1291.) The standard of review is different where it is conceded or clearly established that the defendant received injuries while in police custody, and the only issue is how and why they were inflicted. Under those circumstances the burden of establishing that the injuries were not administered in order to obtain the confession can be met only by clear and convincing testimony as to the manner of their occurrence. (*People v. La Frana* (1954), 4 Ill. 2d 261, 122 N.E.2d 583.) A reviewing court is reluctant to reverse a trial court's determination that a confession was not coerced where the only evidence of coercion is the defendant's own testimony. (*People v. Wilson* (1963), 29 Ill. 2d 82, 193 N.E.2d 449.) It is also important to consider whether there is medical corroboration that injuries have been incurred, and whether there is any adequate alternative explanation for the injuries. (*Wilson*, 29 Ill. 2d 82.) Other important factors include whether the defendant reported the fact of an alleged beating by police, and, if not, whether there is an explanation for the lack of a complaint where the circumstances would make it natural to make one. *People v. Case* (1991), 218 Ill. App. 3d 146, 577 N.E.2d 1291.

In the present case the trial court was convinced that the defendant's injury existed prior to his arrest and that the statement he made to the police was made voluntarily. The State denies that the defendant received injuries while in police custody. The defendant maintains that he was injured by Detective Miller while in police custody. The question we must determine is whether the evidence clearly established that defendant received injuries while in police custody.

Circumstantial evidence lends some support to defendant's testimony that his confession was coerced. Two witnesses testified that they observed the defendant being led from his house by the police at 1:30 a.m. Defendant walked past them as he was led to the police vehicle. Neither witness observed a bandage on defendant's face,

or any bruises. Similarly, the arresting officers testified that they did not notice any cuts or bruises on defendant. However, when the assistant State's Attorney spoke with defendant after Detective Miller interviewed him, he noticed a band-aid over defendant's eye. Moreover, the officer assigned to the lockup on the day of defendant's arrest reported that "arrestee had obvious pain." (Defendant was placed in lockup after being removed from the interview room.) But the lockup officer also wrote on the report "cut over eye, previous injury." The officer testified that "it was not a fresh injury." There is medical corroboration that defendant was injured. An emergency medical technician at the Cook County jail who examined defendant when he was brought to the jail indicated in the report of that examination that defendant had "trauma to left eye."

Detective Miller offered an alternative explanation for the injuries. According to Assistant State's Attorney Marconi's testimony, Miller told him that the injury occurred when defendant was "on the bike during the incident." Detective Miller also testified that the bandage, as seen in the photograph in defendant's exhibit number 2, appeared to be almost the same color as defendant's skin.

Gabriel Gamez testified that after the victim was shot defendant started to run and he slipped. The State has not argued, however, that this fall could explain the injury in question.

Defendant did not tell the State's Attorney that Miller beat him. He testified that he was afraid to tell because Miller was still present. On cross-examination defendant admitted that when he was alone with the State's Attorney he still did not tell that he had been beaten. He did not request any medical treatment.

■ On these facts we cannot say that it is clear that defendant was injured while in police custody. Nor was this point conceded by the State. Therefore, we decline to require the prosecution to demonstrate by clear and convincing evidence that defendant's injury was wholly unrelated to his confession. (*People v. Clark* (1986), 114 Ill. 2d 450, 501 N.E.2d 123.) The trial court properly required the State to prove by a preponderance of the evidence that defendant's confession was given voluntarily. On review we will not disturb the trial court's determination of the motion to suppress unless that finding is against the manifest weight of the evidence. *Clark*, 114 Ill. 2d 450.

We next address defendant's contention that the trial court's determination that the confession was voluntary is manifestly erroneous. In support of this contention the defendant cites *People v. Banks* (1989), 192 Ill. App. 3d 986, 549 N.E.2d 766. *Banks* held that the use of defendant's coerced confession as evidence of guilt constituted prejudicial error. The defendant there complained to Dr. Wal-

ter Romine that the police had beaten him. Defendant gave the doctor a detailed description of the coercion inflicted on him. His testimony and his injuries indicated that he was punched, kicked, beaten with a flashlight, and had a plastic bag placed over his head. He also incurred handcuff injuries. Doctor Romine's examination revealed

> "that defendant had lacerations with scabs on both wrists, consistent with handcuff injuries. Also, defendant had multiple scrapes and scratches over his chest and abdomen. He had a bruised, swollen muscle on his left side, and some kind of a lump under his skin in the lower left rib cage. The whole area was swollen, discolored and tender. There was also a large area of swelling, tenderness and discoloration below each buttock; somewhat lateral. Defendant also had some scratches or scrapes around one of his ankles. In addition, he had a bruise on both legs in the upper posterior section of the upper thigh below the buttocks." (192 Ill. App. 3d at 990.)

Importantly, Dr. Romine testified that defendant's injuries were consistent with defendant's testimony. Dr. Romine also testified that defendant's injuries were not consistent with the alternative explanation offered by the police officers in that case. There it was clearly established that defendant had been injured while in police custody. As a result, the State was required to show by clear and convincing evidence that the injuries were not inflicted as a means of producing the confession. Moreover, in that case the trial court improperly excluded testimony regarding similar coercion of another person by the same police officers. It is also important that there one of the State's own witnesses testified not only that it was "very possible" that he placed the handcuffs on defendant "rather tightly" but also that he punched the defendant several times. That is not this case.

■ In the case at bar, medical testimony does not clearly establish that the injury occurred while defendant was in police custody. According to testimony, it was a previous injury. As a result the State is not required, as it was in *Banks*, to show by clear and convincing evidence that the injuries were not inflicted as a means of producing the confession. While we must view the denials of coercion by the police officers with the conscious awareness that police officers are part of the prosecution team and are interested in the outcome of the case (*Banks*, 192 Ill. App. 3d at 991), their testimony remains competent evidence. All of the State's witnesses here deny involvement in or knowledge of defendant being beaten. It was possible that defendant received the injury before he was in custody and that the witnesses did not notice the band-aid because it was small and flesh

colored. The trial court did not abuse its discretion in denying the motion to suppress the confession.

■ Defendant contends that exclusive of the defendant's supposedly involuntary confession the evidence is insufficient to sustain a conviction. The general rule is that a conviction will be sustained where, viewed in the light most favorable to the prosecution, the record evidence is such that a rational trier of fact could have found guilt beyond a reasonable doubt. (*People v. Holmes* (1990), 141 Ill. 2d 204, 565 N.E.2d 950.) Even assuming, *arguendo*, that defendant's confession was improperly admitted into evidence, the evidence was sufficient to sustain a conviction. Gabriel Gamez testified that he actually witnessed defendant shooting the victim. Two other witnesses, Arturo Calvillo and David Roncone, placed defendant at the scene of the crime. Calvillo, who lived on Cullerton Street, testified that he saw defendant shooting his gun. His father pulled him indoors. While inside he continued to hear gunshots. And, when he came back outside, he saw the victim on the ground. David Roncone also saw defendant shooting a gun. A thorough review of the record in the light most favorable to the prosecution persuades us that even absent the confession a rational fact finder could have found defendant guilty of murder beyond a reasonable doubt. Here, any error was harmless as opposed to prejudicial. The trial court's denial of defendant's motion to suppress, even if improper, did not affect the outcome of the proceeding.

The third issue defendant raises on appeal is whether the trial court denied defendant the right to a fair and impartial jury. Specifically, defendant contends that the trial court improperly denied his request that venireperson Joseph Urick be excused for cause. The trial court's denial of defendant's request was improper if Urick's state of mind was such that with him as a member of the jury defendant did not receive a fair and impartial trial. (*United States v. Wood* (1936), 299 U.S. 123, 81 L. Ed. 78, 57 S. Ct. 177.) In *Wood* the Court states: "The means by which an impartial jury should be obtained are not defined." (299 U.S. at 146, 81 L. Ed. at 88, 57 S. Ct. at 185.) The statement of the juror is proper for the court to consider as evidence of his state of mind to be given the weight to which it is entitled under the circumstances. (*People v. Cole* (1973), 54 Ill. 2d 401, 298 N.E.2d 705.) A reviewing court may reverse a conviction where a juror expressed self-doubt concerning his ability to be impartial. (*Cole*, 54 Ill. 2d 401.) However, the burden is on the party challenging the juror. "Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside." (*Cole*, 54 Ill.

2d at 413.) The trial court's determination as to the competency of the juror should not be set aside unless it is against the manifest weight of the evidence.

■ In the present case defendant raises "a possible basis for bias." The potential juror had a personal relationship with a criminal investigator and he talked with the investigator about some of his cases. According to the defendant, the most important questions and answers given on the issue of Mr. Urick's expression of bias were as follows:

> "Q. Do you feel that you could listen to all the evidence before you made up your mind?
> A. It would be kind of tough.
> Q. Do you think you could not be fair to either the State or the defense?
> A. It would be hard."

Defendant would have this court single out these answers because they "exposed [Mr. Urick's] visceral reaction of bias." But the law is that the examination of a potential juror should be regarded as a whole to determine that individual's state of mind. Having reviewed Mr. Urick's examination in its entirety, we note that the following questions and answers were also exchanged during that examination:

> "Q. Do you agree that it is the State who has to prove [defendant] guilty?
> A. Right.
> Q. If they fail in that burden, would you be able to go back to the jury room and sign not guilty verdicts?
> A. Yes.
> Q. If at the end of the case you felt that they had proved him guilty beyond a reasonable doubt, would you sign guilty verdicts?
> A. Yes.
> Q. Would you follow the law as I told you it was even if you disagreed with what I told you?
> A. Yes. I would.
> Q. Would you let bias or prejudice or sympathy in any way influence your decision?
> A. No."

Mr. Urick did not express any fixed opinion as to the defendant's guilt during *voir dire* examination.

In support of his theory that the trial court improperly denied defendant's request that Mr. Urick be excused for cause, defendant cites two cases: *People v. Johnson* (1991), 215 Ill. App. 3d 713, 575 N.E.2d 1247, and *People v. Stone* (1978), 61 Ill. App. 3d 654, 378 N.E.2d 263. *Johnson* held that the trial court improperly failed to dismiss three prospective jurors for cause. There the prospective jurors were

each asked whether having family members who had been victims of violent crimes or being victims of violent crimes themselves would affect their ability to be fair and impartial. They gave the following equivocal answers.

"Mr. [Michael] Milkovich answered, 'A. I hope not.' "

"Mr. [Richard] Welch responded, 'A. Not really.' "

"Mr. [Raymond] Swope replied, 'A. I don't think so.' " (*Johnson*, 215 Ill. App. 3d at 724.)

The present case is distinguishable. This is not a case where the prospective juror himself or a family member had been the victim of a violent crime. It is also distinguishable in that the issue of impartiality of the jury was raised with respect to the equivocations of only one prospective juror. In *Johnson* the impartiality of three jurors was at issue. Therefore, there was an enhanced danger that the trial was not fair and impartial.

*Stone* held that the trial court's refusal to excuse the veniremen for cause was reversible error. But that case is also distinguishable. Rather than the equivocations present in this case, in *Stone* there were "marked signs of prejudice." The expressions of self-doubt as to the ability to be fair and impartial were emphatic. We will review some pertinent questions and answers in *Stone*.

"ARTHUR DURHAM:

'Q. Do you feel that you could be fair and impartial if you were accepted as a juror?

A. I don't think I could.'

* * *

LELIA PUCKETT:

'Q. Do you feel you could be fair and impartial if you were accepted as a juror?

A. No, ***. I don't think so.'

* * *

RUTH CHOISSER:

'Q. *** Is there anything about [the charge] that would prejudice you against the defendant right off the bat?

A. Yes, I believe there is.' " (*Stone*, 61 Ill. App. 3d at 663-65.)

We conclude that the trial court did not abuse its discretion in refusing to excuse juror Urick for cause.

■ Defendant finally contends that the trial court imposed an excessive sentence. Defendant acknowledges that the sentence imposed by the trial court will be upheld on review absent an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Moreover, the court is not required to articulate its consideration

of mitigating factors or to expressly find that the defendant lacked rehabilitative potential. (*People v. Boclair* (1992), 225 Ill. App. 3d 331, 587 N.E.2d 1221.) Defendant was found guilty of murder and was sentenced to 40 years in the Illinois Department of Corrections. The Unified Code of Corrections provides that the offense of first-degree murder is punishable by a prison term of not less than 20 years and not more than 60 years. (730 ILCS 5/5—8—1 (West 1992).) Therefore, defendant's sentence was within the statutorily approved range of possible sentences. We cannot say that this sentence is grossly disproportionate to the nature of the offense and we decline to disturb it upon review. *People v. Moore* (1988), 178 Ill. App. 3d 531, 533 N.E.2d 463.

For the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.

GORDON, P.J., and MURRAY, J., concur.